In re GRAND JURY PROCEEDINGS.
Appeal of Mitchell HERMANN,
Witness.

In re GRAND JURY PROCEEDINGS.
Appeal of Francine VANNIER.

Nos. 81–5602, 81–5636.

United States Court of Appeals,
Fifth Circuit.*

Unit B

Nov. 10, 1981.

Certiorari Denied March 8, 1982.
See 102 S.Ct. 1630, 1631.

---

* Former Fifth Circuit case, Section 9(1) of Public     Law 96–452—October 14, 1980.

**424**

Terrance A. Bostic, Asst. U. S. Atty., Tampa, Fla., for appellee in both cases.

Bennie Lazzara, Jr., Tampa, Fla., for appellants in both cases.

Barrett S. Litt, Los Angeles, Cal., for appellant in No. 81–5602.

James Reif, Brooklyn, N. Y., for appellant in No. 81–5636.

Before HILL, FAY and ANDERSON, Circuit Judges.

PER CURIAM:

These consolidated appeals arise in the context of civil contempt convictions of two grand jury witnesses, Mitchell Hermann and Francine Vannier, who refused to answer questions before a federal grand jury. Before turning to the issues presented, we first review the facts leading to the convictions from which appeal is taken.

The grand jury before which witnesses Hermann and Vannier were subpoenaed to appear, sitting in the Tampa Division of the Middle District of Florida, is investigating allegations that members and employees of the Church of Scientology conspired and undertook to harass and silence critics of the church in central Florida.[1] In February 1980 witness Hermann had been subpoenaed to testify before a predecessor grand jury investigating the same allegations. After asserting his fifth amendment privilege against self-incrimination, Hermann was granted use immunity and ordered by the district court to testify.[2] In spite of

---

1. Specifically, Scientologists allegedly planned:

   (1) To discredit the congressional campaign of Gabriel Cazares, a former mayor of Clearwater, Florida who vociferously opposes the church, by
   
   (a) staging a fake hit and run accident in Washington, D.C. which would compromise Cazares' reputation;
   (b) framing Cazares with bigamy by bribery and falsification of records;
   (c) infiltrating and undermining his campaign; and
   (d) causing Cazares to retain a lawyer to represent him in litigation against the Church of Scientology who, unknown to Cazares, was a Scientologist;
   
   (2) To discredit another church critic, the St. Petersburg Times, by

   (a) having a Scientologist pose as a messenger for organized crime and deliver an apparent bribe to a reporter; and
   (b) infiltrating a law firm representing the Times in litigation against the church, and thereby stealing confidential legal files relating to that litigation.

   The federal statutes allegedly violated by those Scientologists accused of engaging in such activities include 18 U.S.C. §§ 371 (conspiracy to commit an offense or to defraud the United States), 1341 (frauds and swindles), and 1952 (interstate and foreign travel and transportation in aid of racketeering enterprises).

2. The government apparently petitioned the district court for an order compelling Hermann to testify before the grand jury without invoking the fifth amendment privilege. *See* 18

this order Hermann again refused to answer the questions propounded to him before the grand jury, this time alleging that the questions were the product of illegal electronic surveillance,[3] and moved pursuant to 18 U.S.C. § 3504[4] for disclosure by the government of any electronic surveillance of him or his premises. In support of his motion, Hermann submitted both his own and his lawyer's statements disclosing their belief that their telephone conversations had been intercepted and documentation evidencing federal and Florida investigations of the Church of Scientology.

On June 16, 1980, the government filed its statutorily required response to Hermann's § 3504 motion. In it the government stated that the FBI had searched its records pertaining to electronic surveillance (to the extent the records had been indexed) and had not located anything indicating that Hermann or his lawyer had been monitored. Record searches by all potentially interested federal agencies[5] likewise disclosed no relevant evidence. The district court accepted the government's response as adequate under § 3504. Unfortunately, the life of the grand jury had expired before the district court reached the merits of the government's motion to hold Hermann in contempt.

Consequently, the government subpoenaed Hermann to appear on June 10, 1981 before the federal grand jury which succeeded the grand jury before which Hermann had already appeared. Hermann again was offered immunity under 18 U.S.C. § 6002, but again he refused to testify, filing a § 3504 motion.[6] In support of

U.S.C. § 6001 *et seq.* (1976). Section 6002 provides in part:

> Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—
> (1) a court or grand jury of the United States,
> . . . .
> And the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case . . . .

3. Hermann was asserting his right under 18 U.S.C. § 2515 to have excluded any evidence derived from illegal interception of wire or oral communications. That statute provides:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any . . . proceeding in or before any . . . grand jury . . . of the United States, if the disclosure of that information would be in violation of this chapter.

4. Section 3504 provides in pertinent part:

> (a) In any proceeding in or before any grand jury, of the United States—
> (1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim

> shall affirm or deny the occurrence of the alleged unlawful act;
> . . . .
> (b) As used in this section "unlawful act" means any act or use of any electronic, mechanical, or other device (as defined in Section 2510(5) of this title) in violation of the Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto.

This section provides the means for demonstrating illegal electronic surveillance and therefore for enforcing a witness' § 2515 rights.

5. Those agencies included the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco and Firearms, United States Customs Service, United States Postal Service, the United States Secret Service, the Internal Revenue Service, the Central Intelligence Agency, the National Security Agency, the Department of Defense, and the Immigration and Naturalization Service.

6. The questions which Hermann refused to answer were:

> "Are you now or have you ever been a member of the Church of Scientology?"
> "Are you now or have you ever been an employee of the Church of Scientology?"
> "What positions of employment have you had with the Church of Scientology, particularly an organization referred to as the Guardian Office?"
> "Directing your attention to approximately March of 1976, Mr. Hermann, did you direct Michael Meisner to plan a hit-and-run accident involving Mayor Gabe Cazares during the time in which he would be in Washington in attendance at a Mayor's Conference?"

this second § 3504 motion, Hermann submitted a letter in which the FBI admitted that it found two relevant "see" references in its Las Vegas indices, both his own and his lawyer's affidavits indicating their belief that their conversations were being intercepted, and more documentation evidencing parallel state and federal investigations of the church. In response the government again denied any relevant electronic surveillance prior to June 16, 1980, but as to the time period since then, the government swore only that it had checked with the FBI agent in Tampa supervising the investigation of the church who stated that no surveillance of Hermann had been conducted in the Middle District of Florida or, to his knowledge, anywhere else. The government did not deny that it had monitored Hermann's premises (Hermann lives outside Florida); nor did it respond at all to Hermann's claim that the government cooperated with the state of Florida in monitoring him. The sworn response did state that the questions sought to be asked were based solely upon information derived from interviews of other witnesses and from documents seized from the Church of Scientology, and denied that the questions were in any way derived from any electronic surveillance. Holding the government's response adequate, the district court adjudged Hermann in contempt.

On June 10, 1981 witness Francine Vannier also appeared under subpoena before the federal grand jury sitting in Tampa. She also asserted her fifth amendment privilege.[7] The government petitioned under 18 U.S.C. § 6001 *et seq.* for an order compelling her to testify under a grant of use immunity, and the district court so ordered. Like Mr. Hermann, however, Mrs. Vannier also persisted in her refusal to testify, claiming illegal surveillance by the government and a privilege against adverse spousal testimony. The premise of Mrs. Vannier's assertion of spousal privilege was her belief that her answers to the questions propounded would tend to incriminate her husband. In response to the district court's order to show cause why she should not be held in contempt, Mrs. Vannier joined with Mr. Hermann in moving under § 3504 for disclosure of illegal interception. Filing a single response to Hermann and Vannier's joint motion, the government simply referred to both movants generally in answering the motion. However, as this response covered only the time since the response to Hermann's first motion, the government submitted no denial of federal electronic surveillance of Vannier prior to June 16, 1980. In court the government acknowledged this defect in its response and assured the court that a supplemental affidavit would be submitted. Apparently relying on this, the district court ruled the response to Mrs. Vannier's motion adequate. The government, however, has not supplied a supplemental response. The court further ruled that the spousal privilege was inapplicable on the ground that the answers to the questions would not incriminate her husband and held Mrs. Vannier in contempt.

> "Do you have any information concerning the alleged hit-and-run accident that took place in March of 1976 concerning Gabriel Cazares?"
> "Mr. Hermann what does 'FSM' mean to you?"
> "How about 'Project Tacoless'?"
> "Have you ever heard of Operation Speedy Gonzales?"
> "Do you know Merrill Vannier?"
> "Do you know Francine Vannier?"
> "Do you know Sharon Thomas?"

**7.** The questions which Vannier refused to answer were:
> "Mrs. Vannier, have you ever lived in Pinellas County, Florida?"

> "Are you now or have you ever been a member of the Church of Scientology?"
> "Are you now or have you ever been employed by the Church of Scientology?"
> "Do you know an individual by the name of Gabriel Cazares?"
> "Did you work in the congressional election campaign of Gabe Cazares?"
> "If you worked in the election campaign of Gabe Cazares, were you doing so at the instructions of the Church of Scientology?"
> "Were you sent to Pinellas County, Florida as an undercover operator for an FSM to work upon the campaign committee of Gabriel Cazares?"

These consolidated appeals present this court with two issues: (1) whether the government's response to the § 3504 motions is adequate, despite (a) no denial of electronic surveillance outside the Middle District of Florida since June 16, 1980; (b) no denial of electronic surveillance of appellants' premises; (c) no response at all to the claim that the subpoena and questions were the product of state and federal cooperation in an investigation of the church; and (d) in Vannier's case, no response at all concerning electronic surveillance prior to June 16, 1980; and (2) whether Vannier's allegation that her answers to these questions would tend to incriminate her husband constitutes just cause to refuse to testify.

With respect to Mr. Hermann, we hold that the government's response was adequate and affirm his contempt conviction. As to Mrs. Vannier, we conclude that she did not adequately raise a claim under § 3504 so as to require a government response. Furthermore, her claim of a privilege against adverse spousal testimony is meritorious with respect to only two of the questions which she refused to answer. With this modification, her contempt conviction is also affirmed.

## I. Adequacy of the Government's Responses

### A. Response to Hermann's Motion

█ Under 28 U.S.C. § 1826(a) the district court may confine a recalcitrant grand jury witness if the witness' refusal to testify is without "just cause." However, 18 U.S.C. § 2515 provides a defense to a contempt charge; a grand jury witness may decline to answer questions derived from illegal interception of the witness' communications. In short, a showing that the interrogation would be based upon the illegal interception of the witness' communications constitutes a showing of "just cause" that precludes a finding of contempt. *Gelbard v. United States*, 408 U.S. 41, 47–50, 92 S.Ct. 2357, 2360–62, 33 L.Ed.2d 179 (1972).

█ Section 3504 provides a mechanism by which a potential witness may try to demonstrate that the questions posed were derived from illegal electronic surveillance. "[U]pon a claim . . . that evidence is inadmissible because it is the primary product of [illegal interception] . . ., the opponent of the claim shall affirm or deny the occurrence of the alleged" illegal surveillance. 18 U.S.C. § 3504 (1976). In this circuit the adequacy of the government's denial of illegal electronic surveillance is dependent upon the specificity of the witness' allegation of illegality. *In re Grand Jury Proceedings*, 643 F.2d 226, 229 (5th Cir. 1981); *Brummitt v. United States*, 613 F.2d 62, 65 (5th Cir.), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2990, 64 L.Ed.2d 856 (1980); *United States v. Stevens*, 510 F.2d 1101, 1105 (5th Cir. 1975). Hermann does not argue, and indeed could not argue, that the government's response to his first § 3504 motion was inadequate. A record search by all potentially interested federal agencies which revealed no electronic surveillance of the movant or his attorney is a valid denial. In light of this prior all agency inquiry and response, we hold that the government's response to Hermann's second § 3504 motion was sufficient *as an update* of its first June 16, 1980 response. Were the government's second response the sole reply ever made to a claim by Hermann of illegal interception, we could not pronounce it sufficient.

█ That, however, is not the situation with which we are confronted. Here the government has already made a full inquiry in order to respond to Hermann's claims. Although we are cognizant of the importance of § 3504 as a means of enforcing a witness' right to decline to answer questions based on illegal interception and of the government's statutory burden to affirm or deny, we also are aware of the enormous potential inherent in a § 3504 motion for deliberate delay and hindrance of grand jury proceedings by a recalcitrant witness. As we observed in *United States v. Stevens*, 510 F.2d at 1105–06, "§ 3504 was never intended to permit a witness to thwart the progress of grand jury proceedings." In light of the government's prior response, requiring the government to re-

spond more fully than it has to Hermann's second § 3504 motion would only enhance the utility of § 3504 as a weapon for frustrating legitimate grand jury investigations. Were we to impose such a requirement, a witness could request repeatedly a complete, full agency update, thus indefinitely postponing the investigation.[8]

Evaluating the government's second reply *as a supplemental response*, we conclude that it is a sufficient denial of illegal interception. In a sworn affidavit, a knowledgeable Assistant U.S. Attorney in charge of the grand jury investigation denied knowledge of any electronic surveillance of Hermann or his attorney outside the Middle District of Florida and denied categorically that any of the questions to be asked of Hermann were derived from illegal interception.[9] Viewed in the context of a prior denial of electronic surveillance based on an all agency record check, this reply is a sufficient denial of Hermann's claim of illegal electronic surveillance of him or his attorney and his premises.[10]

Hermann has also alleged that the government's failure to deny that the questions were the product of illegal electronic surveillance by cooperating state agencies justified his refusal to testify. We are not prepared to require the federal government to extend the scope of its inquiry and its required affirmance or denial to state agencies.[11] Moreover, the government's direct and unequivocal denial that any of its questions were derived from any illegal surveillance—state or federal—is a sufficient answer to Hermann's claim. *In re Harris*, 383 F.Supp. 1036, 1039–40 (N.D.Cal.1974).

### B. Response to Vannier's Motion

█ As we observed above, the standard for determining the sufficiency of the government's denial of electronic surveillance varies with the degree of specificity of the allegations raised in a § 3504 motion to compel disclosure. *In re Grand Jury Proceedings*, 643 F.2d 226, 229 (5th Cir. 1981); *United States v. Brummitt*, 613 F.2d 62, 65 (5th Cir.), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2990, 64 L.Ed.2d 856 (1980); *United States v. Stevens*, 510 F.2d 1101, 1105 (5th Cir. 1975). Furthermore, this court has stated that

a "mere assertion" of unlawful surveillance is enough to trigger the government's obligation to affirm or deny. *However, such an "assertion" must be, at a minimum, a positive statement that unlawful surveillance has taken place. A generalized motion based on the possibility of such surveillance ... is not a "claim"* within the meaning of 18 U.S.C. § 3504(a)(1).

*United States v. Tucker*, 526 F.2d 279, 282 (5th Cir.), *cert. denied*, 425 U.S. 958, 96 S.Ct. 1738, 48 L.Ed.2d 203 (1976) (emphasis added). In *Tucker* we held that the movants' allegation that "the Government *may* have

---

**8.** Hermann's case illustrates well this obstructive potential. The life of the grand jury before which Hermann was first subpoenaed to appear expired during the course of the district court's hearing and disposition of Hermann's first § 3504 claim.

**9.** We refuse to construe the government's response that it had "no knowledge" of surveillance outside the Middle District of Florida as a negative pregnant. The prior full agency inquiry and denial plus the categorical denial that any questions are the product of illegal surveillance suffice to remove the disingenuous import Hermann would have us assign to it.

**10.** Again, we wish to emphasize that the failure to deny illegal electronic surveillance of a witness' premises would be fatal were this the government's initial response to a § 3504 motion.

As to the two "see" references to Hermann's name in the FBI's Las Vegas indices, the government has satisfied us that these references were the result of an inquiry from FBI headquarters to the Las Vegas office to determine if Mr. Hermann had been the subject of electronic surveillance and the Las Vegas office's response to that inquiry when the government was making the necessary record search to respond to Mr. Hermann's first § 3504 motion.

**11.** We do not comment upon the federal government's obligation where it is shown that a federal agency exercised considerable dominion and control over a state agency's resources in pursuing a federal investigation. *See generally In re Harris*, 383 F.Supp. 1036, 1039 (N.D. Cal.1974). We do not find such circumstances present here.

conducted illegal electronic surveillance" of them or their attorneys was insufficient to state a § 3504 claim and therefore required no response from the government. As in *Tucker*, we hold here that Mrs. Vannier has failed to state a "claim" of illegal electronic surveillance and that the government, therefore, had no obligation to respond.

While *Tucker* implies that a general assertion warrants a general response, it also makes clear that such an assertion must be a *positive statement* of unlawful surveillance. The only "statement" made by Mrs. Vannier regarding surveillance was her refusal to answer each question asked of her on the ground that the question was "the product of unlawful surveillance." Such an oral objection during testimony is not tantamount to a "claim" for § 3504 purposes. Moreover, although Mrs. Vannier joined Mr. Hermann's motion to compel disclosure, that motion by itself does not contain any positive statement that Mrs. Vannier, her attorney, or her premises were the subject of unlawful surveillance. The motion contains only enumerated requests for disclosure. Mrs. Vannier did not submit, as did Mr. Hermann, an affidavit containing positive assertions of illegal interception. Accordingly, we find entirely meritless Mrs. Vannier's request for reversal of her contempt conviction on the ground that the government's response to her suggestion of surveillance was inadequate.

## II. Privilege Against Adverse Spousal Testimony

Mrs. Vannier relies upon the spousal privilege as an alternative ground for attacking her contempt conviction. She asserts that the scope of protection afforded by this privilege is coextensive with that of the fifth amendment to the United States Constitution. According to this equation, anything which might tend to incriminate the spouse may be deemed privileged to the same degree as it would were the fifth amendment protection against self-incrimination applicable. However, Mrs. Vannier fails to offer any persuasive precedent or

policy reasons in favor of such a rigorous standard; nor, it seems, does such support exist. To the contrary, at least one case has suggested that these two privileges are indeed *not* of the same magnitude or scope:

> The privilege has not ordinarily been construed to allow one spouse to decline to testify merely because the testimony may incrimate [sic] the other. Wigmore, *supra* at 231, n.2.

*In re Snoonian*, 502 F.2d 110, 112 (1st Cir. 1974).

Invocation of any privilege obviously works to exclude from the jury's or the court's consideration what otherwise might be admissible evidence:

> Privileges are impediments to the search for truth, finding their justification in the priority of societal values they serve. The higher-than-truth value served by the [spousal] privilege . . . is the protection of the marital bond.

*United States v. Brown*, 605 F.2d 389, 396 (8th Cir. 1979).

■ The different purposes and social values fostered by the privilege against self-incrimination and the spousal privilege support a distinction in the scope of protection afforded each. While the privilege against self-incrimination, guaranteed by the Constitution in the Bill of Rights, is virtually an absolute, the spousal privilege clearly is not:

> The scope of the marital privilege has never been construed, even at common law, as absolute. *Wigmore, supra.* And as it is in derogation of the public's "right to every man's evidence", *United States v. Bryan*, 339 U.S. 323, 331, 70 S.Ct. 724 [730], 94 L.Ed. 884 (1950), it is not to be "expansively construed."

*In re Snoonian*, 502 F.2d at 112–113.

■ Applicability of the marital privilege is determined on a case by case basis, after a careful balancing of the public's need for disclosure on the one hand against the need to protect the marital relationship on the other.[12] The disfavor into which the mari-

12. According to Rule 501 of the Federal Rules of Evidence,

[e]xcept as otherwise required by the Constitution of the United States or provided by

tal privilege has fallen, largely because of rejection of the archaic notion of the unity of husband and wife, is in stark contrast to the unwavering, constitutionally-protected right of the individual against self-incrimination. Wigmore offers a further reason for the limitation of the spousal privilege:

> [T]he exclusion of a wife on the ground that her testimony may reveal his misconduct, and thus "tend" to charge him, rests on the assumption, false to fact, that her testimony on the stand would in any sense be a revelation, an unsealing of that which was secret. Nothing prevents her from revealing her knowledge out of court; in most instances she has in fact done so. It would be mere hypocrisy to sanction her silence on the stand on the pretext that the husband was thus really safeguarded from her disclosure.

8 Wigmore on Evidence § 2234 at 231–232 (McNaughton rev. 1961).

On the basis of the above, we reject Mrs. Vannier's assertion that the marital privilege is coextensive with the constitutional privilege against self-incrimination, and adopt, instead, its narrow application here. It does not appear to the court that the Vanniers' marriage could be jeopardized or that Mr. Vannier's guilt could be indicated in any way by Mrs. Vannier's answering objective questions containing no reference to her husband. Questions as to whether she resided in Pinellas County; whether she is a member of the Church of Scientology; whether she was ever employed by the Church; and whether she knows Cazares or worked in his election campaign, appear entirely innocuous, neither calculated to, nor capable of incriminating her husband.

The court concedes that answers to the last two questions [13] regarding whether Mrs. Vannier worked in the Cazares campaign at the instruction of the Church of Scientology and whether she was sent to Pinellas County as an undercover operator to work on Cazares' campaign committee might reflect negatively on her husband's innocence. For that reason, we hereby strike Mrs. Vannier's contempt conviction as to those latter questions only, on the grounds of spousal privilege. In doing so, the court rejects a sweeping application of the privilege to the five preceding questions. In *United States v. Brown*, 605 F.2d 389 (8th Cir. 1979), the court reached the same conclusion when it refused to apply the marital privilege to objective questioning:

> Mrs. Clincy's testimony concerning events prior to her marriage was limited to her meeting Clincy and her forming and operating Knox Enterprises with him for a short time prior to May 16, 1978. *Nothing in that testimony reflected illegal activity of any kind on the part of anyone.* The sole testimony of Mrs. Clincy about events after her May 16th marriage to Clincy, and touching Clincy in any way was her statement that he left her within two weeks after the marriage and that she had not seen him since. Her entire remaining testimony about events after her marriage concerned only herself, *i. e.*, statements that signatures on various checks were not her signature.
>
> Clincy was totally unharmed by his wife's testimony. We conclude, moreover, that the marital privilege itself went unscathed in this case. The privilege is not absolute.

605 F.2d at 396 (emphasis added).

Similarly, in *United States v. George*, 444 F.2d 310 (6th Cir. 1977), a husband's claim of marital privilege was rejected where his spouse was not the focus of the investigation and where the question "did not relate to his wife nor to any communication with her." 444 F.2d at 314. Although Mr. Vannier clearly is a target here, thus creating a distinction between the present situation

---

Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

**13.** See the list of seven questions asked of Mrs. Vannier in note 7 *supra.*

and that in *George*, nevertheless the objective nature of the questions was a significant and persuasive factor in the *George* decision, as the court recognizes it to be in the present case.

For the foregoing reasons, the court AFFIRMS Mrs. Vannier's civil contempt conviction, except as to her failure to respond to the last two questions asked of her at the grand jury hearing.

HILL, Circuit Judge, concurring in part and dissenting in part:

I concur fully in the affirmance of the contempt conviction of Mr. Hermann on the ground of the adequacy of the government's response to his claim of illegal surveillance. I would reverse, however, Mrs. Vannier's conviction and uphold her claim of a privilege against adverse spousal testimony.

My disagreement centers on the court's analysis of the privilege against adverse spousal testimony. The majority fails to appreciate the peculiar effect that the probable conspiracy indictment has upon any invocation of that privilege. It is under the peculiar circumstances of a conspiracy involving both husband and wife that I would agree with appellant Vannier that the privileges against adverse spousal testimony and against self-incrimination are coextensive.

Subject to sharp criticism for its basis in outdated notions which regarded the woman as a chattel and denied her a separate legal existence, the privilege against adverse spousal testimony has had a checkered history.[1] Recently the United States Supreme Court modified the privilege "so that the witness spouse alone has a privilege to refuse to testify adversely" and "may be neither compelled to nor foreclosed from testifying." *Trammel v. United States*, 445 U.S. 40, 53, 100 S.Ct. 906, 914, 63 L.Ed.2d 186 (1980). *See also* Fed.R.Evid. 501 (applicable to grand juries under Fed.R.Evid. 1101(d)). As an unwilling witness, Mrs.

Vannier may not be compelled to testify if in fact the testimony would be adverse to her husband's interest. Thus the issue becomes whether Mrs. Vannier's answers to the questions posed[2] would tend to incriminate her husband.

In *Blau v. United States*, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170 (1950), a case involving the fifth amendment privilege against self-incrimination, the Supreme Court noted that the danger of incrimination must not be viewed narrowly. Such a danger may exist, said the Court, even if the answer to a question would not by itself support a conviction. It suffices if the "[a]nswers to the questions asked by the grand jury would have furnished a link in the chain of evidence needed in a prosecution of the petitioner." *Id.* at 161, 71 S.Ct. at 224. In *Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951), the Supreme Court further elaborated on the standard governing incriminating statements:

> The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime . . . . To sustain the privilege, it need only be evident from the implications of the question, *in the setting in which it is asked*, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.

*Id.* at 486, 71 S.Ct. at 818 (citations omitted) (emphasis added). Therefore a claim of incrimination must be upheld unless it is perfectly clear that the answers to the questions could not possibly incriminate. *Id.* at 488, 71 S.Ct. at 819. The setting in which the questions here were asked—a grand jury investigation of, *inter alia*, a conspiracy charge[3] involving Vannier's husband—becomes crucial to a proper resolu-

---

1.  *See generally Trammel v. United States*, 445 U.S. 40, 43–50, 100 S.Ct. 906, 909–12, 63 L.Ed.2d 186 (1980).

2.  *See* note 7 *supra*.

3.  *See* note 1 of the majority opinion *supra*.

tion of a claim of privilege against self-incrimination and against adverse spousal testimony.

The government does not dispute that Mrs. Vannier's husband, Merrill Vannier, is one of the subjects or targets of the federal grand jury's investigation. Allegations concerning Mr. Vannier include claims that he is a member of the Church of Scientology who participated in the unlawful campaign to harass, discredit and silence organizations critical of the church. More specifically, the government believes that Merrill Vannier was the attorney who, as an undercover operative for the church, sought to and did represent Gabriel Cazares in his litigation with the church and breached the attorney-client relationship with Cazares by disclosing confidential communications to the church and its attorneys. Along with witnesses Hermann and Mrs. Vannier, Mr. Vannier was subpoenaed to appear before the federal grand jury in the Middle District of Florida on June 10, 1981. Mr. Vannier asserted his fifth amendment privilege against self-incrimination in response to the questions posed to him.[4] Significantly, the government did not offer Mr. Vannier use immunity in order to compel his testimony. This omission reinforces any suspicion that the government plans to indict Mr. Vannier.

With this setting in mind, it becomes clear that the questions posed to Mrs. Vannier were not "innocuous," as the government contends and the majority agrees, but contain potential for providing a link in a chain of evidence which might be used to convict Mr. Vannier. Under the law of conspiracy, the acts of one co-conspirator in furtherance of the unlawful agreement are admissible against all, even in the absence of the other's approval of these overt acts.

*United States v. Netterville*, 553 F.2d 903, 912 (5th Cir. 1977), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978). The overt act itself need not be criminal if it is in furtherance of the unlawful agreement, *United States v. Enstam*, 622 F.2d 857, 867 (5th Cir. 1980), and it may occur before or after the others join the conspiracy. *United States v. Netterville*, 573 F.2d at 912. If, for example, Mrs. Vannier were to testify that she moved from California to Pinellas County, Florida with her husband in 1975, and the government proves that the purpose of the move was to engage in, as a field service member of the Church of Scientology, any of the alleged unlawful activities recited in footnote 1, this overt act would provide evidence admissible against Mr. Vannier as an alleged co-conspirator. Likewise, an affirmative answer by Mrs. Vannier that she infiltrated the election campaign of Gabriel Cazares would prove an act attributable to Mr. Vannier. This brief discussion suffices to show that, given the scope of the grand jury's investigation into activities of members and employees of the Church of Scientology, it is not perfectly clear that the answers to the questions could not possibly incriminate Mr. Vannier. *Hoffman v. United States*, 341 U.S. at 488, 71 S.Ct. at 819.

This possibility of incrimination, which arises by virtue of the fact that a conspiracy is at issue, convinces me that Mrs. Vannier's claim of privilege should be upheld. The majority apparently concedes that Mr. Vannier's guilt might be indicated and the Vannier marriage jeopardized by Mrs. Vannier's answers to at least two of the questions. This is sufficient to persuade the court to uphold the privilege as to these questions. But the other apparently lawful

---

4. These questions included the following:

"Are you now or have you ever been a member of the Church of Scientology?"

"Have you ever held an office in the Church of Scientology?"

"In fall 1975, 1976, and 1977 did you ever reside in Pinellas County?"

"Have you ever attended or graduated from any law school in the United States?"

"What state bars are you a member of? Aren't you a member of the Florida Bar?"

"In 1975, when you flew to Florida, did you come with your wife?"

"Do you know Gabriel Cazares?"

"Did you ever have an attorney-client relationship with Gabe Cazares?"

"Were you ever employed in Pinellas or Hillsborough Counties as an attorney?"

"Did you ever obtain or seek a job with James Russell of the State Attorney's Office?"

"Do you know Mitch Hermann?"

acts which were the subject of the other "objective" questions can also incriminate when performed in the context of a conspiracy, an unlawful agreement to accomplish lawful objectives by unlawful means or to accomplish unlawful objectives. For this reason, I view it imperative that the privilege against adverse spousal testimony be honored where the government seeks to indict one spouse for a conspiracy involving both and attempts to procure that indictment through incriminatory testimony of the remaining spouse.