442 S.E.2d 223

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Harry JARRELL, Defendant Below, Appellant.**

**No. 21625.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 21, 1993.

Decided Feb. 18, 1994.

Kristen L. Keller, Chief Deputy Pros. Atty. of Raleigh County, Beckley, for appellee.

H.L. Kirkpatrick, III, Ashworth & Kirkpatrick, Beckley, for appellant.

BROTHERTON, Justice:

The appellant, Harry Gene Jarrell, was convicted of first-degree murder for his role as a participant in the drowning death of his brother-in-law, Jackie Dale Smith. He now appeals from the March 26, 1992, order of the Circuit Court of Raleigh County, West Virginia, which sentenced him to life in prison without the possibility of parole.

The body of forty-one-year-old Jackie Dale Smith was found in Lake Stephens in Raleigh County, West Virginia, on July 20, 1989. The appellant and his sister, Ann Smith, were both indicted for the murder of her husband. The Smiths were first married in the mid 1970's. Jackie Dale Smith was disabled in a coal mine accident shortly thereafter, and the couple divorced after fourteen years of marriage in October, 1988. They remarried on June 29, 1989. Twenty days later, Jackie Dale Smith was found dead.

In its prosecution of the case, the State theorized that Ms. Smith had long considered killing her husband, and eventually enlisted her brother's assistance in committing the crime. At trial, several witnesses testified about conversations with Ms. Smith in which she discussed killing her husband either by drowning or electrocution.

The most damaging testimony against the appellant came from his former close friend, Matt Strogen, who stated that the appellant offered to pay him $30,000.00 if he would help him kill his brother-in-law. According to Strogen, he agreed to help the appellant commit the murder in July, 1989. The appellant and Strogen had several conversations in which they discussed how to kill Smith but make it look like an accident. Strogen testified that on the night of the murder, he and the appellant went to Lake Stephens and began to fish. They were joined by the decedent and his wife, Ann, at around midnight. The decedent also began to fish, and, at some point, Strogen pushed him into the water. Neither the decedent nor Strogen could swim. The appellant apparently helped to keep the decedent submerged in the water. Smith's truck and fishing gear were left at the scene, and his body was

discovered at approximately 8:00 p.m. the following day.

Strogen left the Beckley, West Virginia, area soon after Smith's murder and was subsequently arrested on drug charges in Texas. When he was paroled in July, 1990, two members of the Raleigh County Sheriff's Department were waiting to return Strogen to West Virginia to face nine outstanding felony charges related to copper theft. These officers later testified that during the ride from the prison to the airport, Strogen confessed to the murder of Jackie Dale Smith.

The appellant and his sister, Ann Smith, were each convicted of first-degree murder in connection with Smith's drowning death. On appeal, the appellant now assigns several errors and asks this Court to set aside the jury verdict and award him a new trial.

■ First, the appellant argues that the trial court committed prejudicial error when it allowed the prosecution to read his wife's grand jury testimony to the jury at his trial. However, a careful review of the record and consideration of the historical purposes and societal interests behind marital privileges leads this Court to conclude that there was no error in this instance.

■ The appellant contends that by reading Barbara Jarrell's grand jury testimony into evidence at his trial, the prosecution violated the adverse spousal immunity privilege, W.Va.Code § 57–3–3 (1966), which "prohibits not only the testimony of a spouse but even the calling of the spouse as a witness." *State v. Evans*, 170 W.Va. 3, 287 S.E.2d 922, 925 (1982). West Virginia Code § 57–3–3 (1966) prohibits adverse testimony from a witness-spouse against another, absent consent, in a criminal trial:

> In criminal cases husband and wife shall be allowed, and, subject to the rules of evidence governing other witnesses, may be compelled to testify in behalf of each

other, but neither shall be compelled, nor, without the consent of the other, allowed to be called as a witness against the other except in the case of a prosecution for an offense committed by one against the other, or against the child, father, mother, sister or brother of either of them.

In addition, a confidential communications privilege is found in W.Va.Code § 57–3–4, which states that "[n]either husband nor wife shall, without the consent of the other, be examined in any case as to any confidential communication made by one to the other while married, nor shall either be permitted, without such consent, to reveal in testimony after the marriage relation ceases any such communication made while the marriage existed." [1]

In *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), the United States Supreme Court limited the federal marital privilege against adverse spousal testimony. The Court held that only the witness-spouse has the privilege to refuse to testify adversely: the witness cannot be compelled to testify, nor be foreclosed from testifying. In *Evans, supra*, this Court noted the impact of the *Trammel* decision:

> Under the Federal Rules of Evidence testimonial privileges are "governed by the principles of the common law as they may be interpreted ... in the light of reason and experience." *Fed.R.Evid. 501*. Hence, the Supreme Court in *Trammel* was free to modify the privilege against spousal testimony as long as "reason and experience" supported such a change. However, that change only affects cases conducted in jurisdictions in which the Federal Rules of Evidence or the common law rules concerning privileges apply ... [I]n this Court ... the contents of the privilege against spousal testimony are controlled by W.Va. Code, 57–3–3 [1923]. Should "reason and experience" dictate a

1. An informative background discussion on modern marital privileges is found in Steven M. Gofman, Note, *"Honey, The Judge Says We're History": Abrogating The Marital Privileges Via Modern Doctrines of Marital Worthiness*, 77 Cornell L.Rev. 843, 846–849 (1992). *See also* Anne N. DePrez, Note, *Pillow Talk, Grimgribbers and Connubial Bliss: The Marital Communications Privilege, 56 Ind.L.J. 121 (1980), in which the author discussed the marital communication privilege as it is applied in most jurisdictions and argues that "the privilege is more of a hindrance to the efficient administration of justice than an effective device safeguarding the institution of marriage." Id.* at 123.

change in that statute, it is up to our Legislature to draft and pass appropriate modifications.

287 S.E.2d at 924. Although this decision does not impact upon our statute, the *Trammel* Court addressed the historical context of the development of marital privileges and considered the continued viability of such privileges. The Court noted that support for the privilege against adverse spousal testimony had eroded since the Supreme Court decision in *Hawkins v. United States,* 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958), which "left the federal privilege for adverse spousal testimony where it found it, continuing 'a rule which bars the testimony of one spouse against the other unless both consent.' [*Hawkins,* 358 U.S.] at 78 [79 S.Ct. at 138]." *Trammel,* 445 U.S. at 46, 100 S.Ct. at 910.[2] In *Trammel,* the United States Supreme Court emphasized that:

> It is essential to remember that the *Hawkins* privilege is not needed to protect information privately disclosed between husband and wife in the confidence of the marital relationship—once described by this Court as "the best solace of human existence." *Stein v. Bowman,* 13 Pet. [209], at 223 [10 L.Ed. 129 (1839)]. Those confidences are privileged under the independent rule protecting confidential marital communications. *Blau v. United States,* 340 U.S. 332 [71 S.Ct. 301, 95 L.Ed. 306] (1951); .... The *Hawkins* privilege is invoked, not to exclude private marital communications, but rather to exclude evidence of criminal acts and of communications made in the presence of third persons.

*Id.* at 51, 100 S.Ct. at 912–13. The Court concluded that:

> Our consideration of the foundations for the privilege and its history satisfy us that "reason and experience" no longer justify

so sweeping a rule as that found acceptable by the Court in *Hawkins.* Accordingly, we conclude that the existing rule should be modified so that the witness-spouse alone has a privilege to refuse to testify adversely; the witness may be neither compelled to testify nor foreclosed from testifying. This modification—vesting the privilege in the witness-spouse—furthers the important public interest in marital harmony without unduly burdening legitimate law enforcement needs.

*Id.* at 53, 100 S.Ct. at 914.

We find that no marital privileges are applicable to the circumstances presented in the case now before us. Barbara Jarrell did not provide adverse testimony against her husband, nor did she betray any private marital communications. The portion of Barbara Jarrell's grand jury testimony that was read to the jury was quite clearly directed towards ascertaining co-defendant Ann Smith's role in her husband's death. Barbara Jarrell mentioned her own husband, the appellant herein, only once in the grand jury testimony that was read by the prosecution at his trial. Even this was simply an indirect reference to him being among those present at the Smith's home early on the night of the murder.

> QUESTION: ... Who else was at Jackie Dale Smith's house on the night of July 19, 1989?
>
> ANSWER: When I left?
>
> QUESTION: When you left.
>
> ANSWER: Jackie was home, Ann was home, the kids were home—well, William and Harry was there, Matt was there, *my husband Harry was there,* my daughter Christine was there and, of course, my baby was there, she was with me,—oh, and some of the neighborhood boys were there. (Emphasis added.)

2. For further discussion of the impact of the *Trammel* decision, *see generally* Jeffrey Eugene Jones, Note, *Federal Marital Privileges in a Criminal Context: The Need for Further Modification since Trammel,* 43 Wash. & Lee L.Rev. 197 (1986), and Tom A. Glassberg, Note, *Adverse Spousal Privilege: Dead or Alive?,* 63 Wash. U.L.Q. 509 (1985), in which the author states that "commentators interpret *Trammel* to allow only a witness spouse to invoke the adverse spousal privilege. If the witness spouse is willing to testify, the defendant spouse cannot prevent such testimony." However, the author of this note argues that *"Trammel* does not extend that far. Instead, courts should grant the defendant spouse the right to challenge the voluntariness of adverse spousal testimony, thereby restoring some semblance of the spousal privilege." *Id.*

The only thing this testimony established about the appellant, Barbara Jarrell's husband, was that he was present at the Smith residence early on the night in question. Others were present there that night as well, and thus the mere knowledge of his presence cannot be considered privileged information.[3]

As a general rule, we would agree that the grand jury testimony of a witness-spouse should not be read into evidence at trial, in lieu of live testimony, in situations in which a spouse has invoked the adverse spousal testimony privilege. However, the reasons for disallowing the grand jury testimony are not compelling in this case. The testimony in the record makes it quite clear that Barbara Jarrell was called before the grand jury primarily for the purpose of providing evidence against her sister-in-law, Ann Smith, and not her own husband. There was nothing adverse to him in the testimony that was read at his trial. The marital privilege is not absolute. When the witness-spouse's testimony is not adverse to the defendant-spouse, such testimony does not necessarily fall within the protection of the marital privilege.[4] Therefore, we conclude that the fact that Barbara Jarrell's grand jury testimony was read at her husband's trial does not warrant reversal in this instance.

Next, the appellant argues that the trial court erred when it permitted the prosecutor to read the grand jury testimony of the appellant's sister, Charlotte Sharp, to the jury at his trial. The appellant urged the court to declare Ms. Sharp incompetent to testify. The record shows that when the prosecution called Ms. Sharp to the stand, defense counsel immediately questioned her competency, and counsel for both parties approached the bench for a conference. Defense counsel stated, "I understand that she's receiving Social Security disability based on a mental disability, and I have real problems with her ability to testify." The prosecution responded by telling the trial court that "when she appeared before the grand jury . . . originally she was claiming to be insane, and a couple of hours in jail cured her . . . if she is deemed unavailable for mental incompetency, then I think the court has ruled that if we think it's a fake, then we would be entitled to introduce to the jury her grand jury testimony and read to the jury her [Nov. 5, 1990] statement to the police . . . if she's unavailable."

An *in camera* hearing followed, during which the State asked that Ms. Sharp be declared an unavailable witness. The trial judge initially ruled that she was mentally competent to testify, but he reversed himself almost immediately, referring to Ms. Sharp's continuing bizarre and uncooperative behavior as "cooperative incompetence." It appears that although the trial judge had stated that "I believe that she's competent to get on the stand . . . I have nothing here to indicate that she isn't" and that "I think the Court has no grounds but to make a determination that she's competent to testify," he changed his mind after Ms. Sharp continued to be unresponsive to the court's instruction. The following exchange, which took place in the courtroom after the *in camera* hearing but before Ms. Sharp was set to begin testifying, was obviously the proverbial "last straw:"

> THE COURT: Well, whatever; whatever the question, just answer yes or no. Don't volunteer.

---

3. Similarly, in *Fuller v. Fuller,* 100 W.Va. 309, 130 S.E. 270 (1925), this Court explained that "a communication between husband and wife, in the known presence and hearing of a third person capable of comprehending what is being said, is not so confidential as to be a privileged communication, . . . and either the husband or wife or the third person who was present may testify in regard thereto." *Id.* 130 S.E. at 271.

4. For a discussion of how courts have defined adverse testimony, *see* Barbara Gregg Glenn, Comment, *The Deconstruction of the Marital Privilege,* 12 Pepp.L.Rev. 723, 755 (1985). The author states that:

> Not all testimony that is situationally adverse to the witness' spouse falls within the protection of the marital privilege. The privilege is not absolute, and a witness-spouse may be compelled to answer certain questions, even in a grand jury investigation where the spouse is a target. The Fifth Circuit Court of Appeals ruled in *In re Grand Jury Proceedings* [664 F.2d 423 (5th Cir.1981), *cert. denied,* 455 U.S. 1000 [102 S.Ct. 1630, 71 L.Ed.2d 866] (1982)] that the witness-spouse could be required to answer " 'objective' questions containing no reference to her husband . . . neither calculated to, nor capable of incriminating her husband."

THE WITNESS: But that would be so convenient, I know.

THE COURT: Just a minute. Don't mention something that happened somewhere else, just the questions that are asked. Do you understand?

THE WITNESS: I don't understand the last part of it. But what I do understand is certain people that needs punished for what they did—

THE COURT: Well, that's not—

THE WITNESS: —and they are going to walk away and not be punished, and they're not here, they're around, they're in the prosecutor's office—

THE COURT: Well—

THE WITNESS: —and they are damn good liars—

[DEFENSE COUNSEL]: Charlotte—

THE WITNESS: They are a liar and a half—I don't lie.

THE COURT: In view of this, *I believe I'll just let them read the stuff. I don't believe we could do that. I mean, I've tried your way and it's just not working.*

It was at this point that the judge stated that "[h]er incompetency is not as to her mental incompetency but as to her cooperative incompetence. . . ." Then, over defense objections, the trial court permitted the State to read Ms. Sharp's prior grand jury testimony, as well as previous trial testimony, instead of allowing her to testify in person before the trial jury.

■ The appellant now contends that reading Ms. Sharp's prior testimony to the jury violated his constitutional rights because he was denied the right to confront a witness against him. We agree, and find reversible error on this point. "The Confrontation Clause contained in the Sixth Amendment to the United States Constitution provides: 'In all criminal prosecutions, the accused shall ... be confronted with the witnesses against him.' This clause was made applicable to the states through the Fourteenth Amendment to the United States Constitution." Syllabus point 1, *State v. James Edward S.,* 184 W.Va. 408, 400 S.E.2d 843 (1990). "The Sixth Amendment to the United States Constitution guarantees an accused the right to con-

front the witnesses against him. The Sixth Amendment right of confrontation includes the right of cross-examination." Syllabus point 1, *State v. Mullens,* 179 W.Va. 567, 371 S.E.2d 64 (1988).

■ The State maintains that the appellant was at fault here because defense counsel did not avail itself of the opportunity to cross-examine Ms. Sharp after the State had read her prior testimony to the jury. However, we agree with the position advanced by the appellant, which is, quite simply, that a witness cannot be deemed incompetent to testify for one side but competent for the other and therefore available for cross-examination. It is apparent from the record that the trial court was uncertain about exactly how to characterize Ms. Sharp's behavior and whether to actually label her as an "unavailable" or "incompetent" witness. However, irrespective of how the trial court wavered in this regard, the bottom line is that she was not allowed to testify in person before the trial jury, but the prosecution was nonetheless permitted to read testimony into the record that was arguably just as bizarre and unreliable as anything she might have said on the stand.

■ This Court has recognized that " ' "[t]he question of the competency of a witness to testify is left largely to the discretion of the trial court and its judgment will not be disturbed unless shown to have been plainly abused resulting in manifest error." Point 8, Syllabus, *State v. Wilson,* 157 W.Va. 1036, 207 S.E.2d 174 (1974).' Syl. Pt. 3, *State v. Butcher,* 165 W.Va. 522, 270 S.E.2d 156 (1980)." Syllabus point 2, *State v. Merritt,* 183 W.Va. 601, 396 S.E.2d 871 (1990). We find that the trial court abused its discretion in this instance when it permitted the prosecution to read Ms. Sharp's prior testimony to the jury. She was available to testify and was never declared incompetent. As a result of this rather strange set of circumstances, we must conclude that the appellant's Sixth Amendment rights were violated. For this reason, this case must be reversed.

■ We will only briefly address the appellant's final assignment of error, in which he argues that the Confrontation Clause was

also violated when the trial court allowed co-defendant Ann Smith's numerous tape-recorded statements to the police to be played to the jury. The appellant contends that because the police officer's conversations with Ms. Smith were recorded after Jackie Dale Smith's death, they cannot be admitted as evidence under a hearsay exception as statements made "during the course and in furtherance of the conspiracy," W.Va.R.Evid. 801(d)(2)(E).[5] We agree that the tape-recorded conversations were inadmissible. Their relevance is questionable, and Ms. Smith's statements to the police quite clearly were not made "during the course and in furtherance of the conspiracy." Moreover, the record does not support the contention that her lengthy conversations with the po-lice were "expressly introduced ... as lies," as the prosecution attempts to claim in order to avoid the hearsay rule.

For the reasons set forth above, we hereby reverse the March 26, 1992, order of the Circuit Court of Raleigh County, West Virginia, and remand this case to that court for action consistent with this opinion.

Reversed and remanded.

---

5. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." W.Va.R.Evid. 801(c).