457 S.E.2d 456

STATE of West Virginia, Plaintiff Below, Appellee,

v.

Kimberly Don BRADSHAW, Defendant Below, Appellant.

STATE of West Virginia, Plaintiff Below, Appellee,

v.

Kimberly Don BRADSHAW, Defendant Below, Appellant.

Nos. 22302, 22553.

Supreme Court of Appeals of West Virginia.

Submitted March 7, 1995.

Decided March 27, 1995.

Jacquelyn I. Custer, Sr. Asst. Atty. Gen., Charleston, for appellee.

James E. Spurlock, Huntington, for appellant.

CLECKLEY, Justice:

The defendant below and appellant herein, Kimberly Don Bradshaw, was indicted and tried by a jury on two counts of murder and one count of aggravated robbery, all arising from the same incident. In the first trial, the defendant was found guilty of the second degree murder of George Eckert and acquitted of the aggravated robbery charge. The trial judge declared a mistrial on the second murder charge resulting from the death of Patricia Eckert after the jury was unable to reach a verdict. In a subsequent trial, the defendant was convicted of the first degree murder of Patricia Eckert with a recommendation of mercy.

In this consolidated appeal, the defendant argues the trial court erred in admitting testimony and evidence concerning the defendant's interrogation by police and his subsequent confession; in permitting the defendant's wife to testify for the prosecution at trial; in admitting evidence discovered as a result of his wife's speaking with the police;

in admitting evidence of the defendant's trial reenactment of the homicide scene; and in giving a fatally defective jury instruction. Finding no reversible error, we affirm the judgment below in all respects.

## I.

### FACTS AND PROCEDURAL BACKGROUND

On May 27, 1992, the defendant telephoned Mr. Eckert at his pawn shop around closing time and asked Mr. Eckert to wait for him because the defendant was running late. The defendant arrived at the pawn shop around 7:00 p.m., as one of the pawn shop's employees, Theresa Chapman, was finishing the day's receipts and preparing to leave. According to Ms. Chapman, Mr. Eckert removed some collectible coins from a safe in anticipation of the defendant's purchasing them. The defendant claims he only went to the pawn shop to have some of his coins appraised and not to purchase any additional coins.

After Ms. Chapman's departure, the parties' versions of the events differ drastically. The prosecution claims the defendant placed a gun against the forehead of Mr. Eckert and fired a single fatal shot. Mrs. Eckert was killed by a second shot fired through the back of her head. The defendant does not dispute the fact that he killed George and Patricia Eckert. However, he denies deliberately placing the gun against Mr. Eckert's head, arguing instead that he killed the Eckerts in self-defense. According to the defendant, he fired his weapon only after both the Eckerts reached for their guns.

After killing the Eckerts, the defendant returned home and took his wife, Mary Bradshaw, to the Huntington Mall without revealing the shootings to her. After leaving the Mall, the defendant and his wife spent the night at the Ramada Inn near the Huntington Mall. On the morning of May 28, 1992, the defendant took a flight from the Tri-State Airport in Huntington to the Cincinnati/Northern Kentucky International Airport (Cincinnati Airport) located in Kentucky. After arriving at the Cincinnati Airport, the defendant changed his ticket destination from Miami, Florida, to Houston, Texas.

When the Eckerts did not return home after work on May 27, 1992, their daughter began searching for them. This search ended in the discovery of George and Patricia Eckerts' bodies at approximately 1:00 a.m. on May 28, 1992. Immediately thereafter, the investigating officers began to search for the defendant as the last person known to see the Eckerts alive.

The officers first went to the defendant's home where they spoke with the defendant's brother-in-law, Nathan Tapley, who was babysitting the defendant's children. Mr. Tapley informed the officers that the defendant and his wife were spending the night at the Charleston Marriott because the defendant was planning to fly to South America by way of Miami.[1]

Forensic testing established the murder weapon to be a .38 caliber Colt handgun the defendant borrowed from his pastor, Patrick Elliot, on May 13, 1992. Mr. Elliot testified at trial that the defendant called him from the hotel around 9:00 p.m. on the evening of the killings and asked him to pick up the gun.

The investigating officers eventually located the defendant during his layover in the Cincinnati Airport. At approximately 8:47 a.m. on May 28, 1992, the Cincinnati Airport police informed the defendant that he was not under arrest and orally advised him of his *Miranda* rights during the automobile ride to their office. The defendant agrees that he voluntarily accompanied the Airport police to their office for purposes of an interview.

After arriving at the office, Lieutenant Kerry Curry of the Airport police again advised the defendant of his *Miranda* rights, this time orally and in writing. The defendant executed a waiver of rights form and agreed to speak to the officers without the assistance of an attorney.

---

1. The statements of Mary Bradshaw contradict those of Mr. Tapley. Mrs. Bradshaw told the police she and her husband stayed in a Hunting- ton hotel instead of the Charleston Marriott and the defendant flew out of the Huntington airport.

The investigating officers from West Virginia arrived at the Cincinnati Airport around 10:52 a.m. Shortly thereafter, the defendant consented to a search of his blue Reebok bag. At 11:24 a.m., Corporal K.S. Stickler again advised the defendant of his *Miranda* rights and repeated the defendant was not under arrest. The defendant again indicated he was willing to be interviewed and executed a second waiver of rights form. The interview with the defendant was video taped.

Corporal Stickler interviewed the defendant until approximately 12:11 p.m., when the defendant agreed to a polygraph examination. After having some difficulty locating a polygraph examiner, Corporal Stickler gave the defendant a number of options as to how to proceed, including traveling back to West Virginia to be interviewed. The defendant then asked Corporal Stickler if he was the prime suspect in the murders. Corporal Stickler informed the defendant that he was the last person known to see the Eckerts alive.

Shortly thereafter, the defendant told Corporal Stickler he wanted to leave. However, the defendant agreed to wait for Corporal Stickler to make a telephone call and tell "them" (presumably, West Virginia officials) the defendant was leaving. Approximately twenty minutes later, Lieutenant Curry returned to the interview room and informed the defendant he was under arrest. Lieutenant Curry again gave the defendant oral and written *Miranda* warnings, and the defendant executed a third waiver of rights form.

During the questioning that followed, the defendant admitted to killing the Eckerts, but claimed he killed the couple in self-defense. The defendant stated he killed the couple after Mr. Eckert pulled a hammerless, fly-weight, chrome-plated .38 Special, snub-nosed pistol on him, while Mrs. Eckert reached for her purse or bag which the defendant believed contained a gun. The defendant maintained his self-defense argument through both trials.

2. The defendant argues that both his Fifth and Sixth Amendment rights were violated under *Miranda*. However, we find the Sixth Amendment to be inapplicable to this situation in that the interrogation did not occur "at or after the initiation of adversary judicial criminal proceed-

The defendant first complains that his extrajudicial statements are inadmissible. Similarly, he asserts the testimony of Lieutenant Curry and other physical evidence should not have been admitted at either trial because the evidence was obtained pursuant to an interrogation of the defendant lasting several hours without the benefit of requested counsel. The defendant's second area of errors involves testimony and evidence derived from communication with his wife. The defendant argues it was error to admit his wife's testimony at both trials because her testimony violates both the marital spousal immunity statute and the confidential communication privilege between spouses. Additionally, he claims the trial court committed error in admitting evidence obtained from his pockets at the time of his arrest considering the evidence and the arrest were the products of the impermissible questioning of the defendant's wife. The third assignment of error concerns the in-court reenactment evidence of the defendant. Finally, the defendant claims the trial court committed reversible error when it gave a defective *Jenkins* instruction. We will address each of these assignments of error in turn.

## II.

### DEFENDANT'S CONFESSION

The defendant asserts the police officers violated his rights under *Miranda* by failing to cease the interrogation and provide requested counsel.[2] As a result of these violations, the defendant claims the trial court erred in admitting the testimony of Lieutenant Curry and certain physical evidence during both trials and in admitting the video-taped confession in the second trial. The defendant also contends the video-taped confession was coerced. The State, of course, disagrees and asserts no violations occurred during the interrogation and the defendant's confession was voluntary.

ings[.]" *See Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411, 417 (1972). *Miranda* warnings, protective of Fifth Amendment interests, are the rights the defendant seeks to vindicate.

■ The burden is on the State to prove by a preponderance of the evidence that extrajudicial inculpatory statements were made voluntarily before the statements can be admitted into evidence against one charged with or suspected of the commission of a crime. *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *State v. Zaccario*, 100 W.Va. 36, 129 S.E. 763 (1925).[3] Absent a knowing and intelligent waiver of the Fifth Amendment right against self-incrimination, a statement made by a suspect during in-custody interrogation is inadmissible. *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 724 (1966). Even when a suspect has made a valid waiver, an inculpatory statement is inadmissible if it appears it was made involuntarily. *See Miller v. Fenton*, 474 U.S. 104, 109-10, 106 S.Ct. 445, 449, 88 L.Ed.2d 405, 410 (1985); *State v. Slaman*, 189 W.Va. 297, 300, 431 S.E.2d 91, 94 (1993). Whether such a statement was voluntary or the result of coercive police activity is a legal question to be determined from a review of the totality of the circumstances.

■ In examining the totality of the circumstances, a court must consider a myriad of factors, including the defendant's age, intelligence, background and experience with the criminal justice system, the purpose and flagrancy of any police misconduct, and the length of the interview. *State v. Sugg*, 193 W.Va. 388, 456 S.E.2d 469 (1995). The totality of the circumstances includes moral and psychological pressures to confess emanating from official sources. *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *State v. Honaker*, 193 W.Va. 51, 454 S.E.2d 96 (1994).

As we said in *State v. Farley*, 192 W.Va. 247, 452 S.E.2d 50 (1994), this Court must make an independent evaluation of the evidence to determine whether a defendant's statement was voluntary.[4] In doing so, we give deference to the observations of the trial court and its findings of fact, except as to the ultimate issue of voluntariness. With this background, we will review each of the defendant's contentions.

### A.

### *Miranda*

The defendant's first assignment of error is that the trial court erred in admitting the testimony of Lieutenant Curry of the Cincinnati Airport police, the video-taped confession,[5] and the evidence obtained at the time of the Airport interrogation because all were obtained *during an interrogation conducted over several hours without the assistance of counsel.*

On May 28, 1992, the defendant was detained by the Cincinnati Airport police, as requested by the West Virginia State police. Initially, the officers told the defendant he was not under arrest and they wanted only to question him. The defendant voluntarily accompanied the officers and responded to the questioning. A few hours later, the officers placed the defendant under arrest and the interrogation continued.

During the course of the defendant's interrogation, the officers *Mirandized* the defendant four times. Each time the defendant was *Mirandized,* he responded he understood his rights. However, at trial and now on appeal, the defendant argues the testimony of Lieutenant Curry and the defendant's video-taped confession were improperly ad-

---

3. Although the standard for proving a *Miranda* waiver was labeled in that decision as a "heavy burden," the Supreme Court in *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), made clear there is no difference between the burden of proof in *Miranda* and that in the "voluntariness" context. Both are governed by the preponderance standard.

4. We stated in Syllabus Point 2 of *State v. Farley, supra:*

"This Court is constitutionally obligated to give plenary, independent, and *de novo* review

to the ultimate question of whether a particular confession is voluntary and whether the lower court applied the correct legal standard in making its determination. The holdings of prior West Virginia cases suggesting deference in this area continue, but that deference is limited to factual findings as opposed to legal conclusions."

*See also Gwaltney v. Commonwealth,* 19 Va.App. 468, 452 S.E.2d 687 (1995) (same).

5. The video-taped confession is an issue only in the second trial.

mitted because he invoked his right to remain silent and his right to an attorney during the interrogation. The State asserts the defendant's statements were voluntary and the defendant did not clearly assert his right to remain silent or to have counsel present.

### 1. Right to Counsel

The defendant contends several ambiguous statements during the interrogation were actually an invocation of his right to counsel. The State asserts the defendant voluntarily confessed and all the defendant's *Miranda* rights were scrupulously honored. In fact, the State contends any attempts to invoke *Miranda* rights were ineffectual because they were ambiguous.

In *Miranda,* the Supreme Court held that, in order to protect a defendant's right against compelled self-incrimination under the Fifth Amendment, before police initiate custodial interrogation, they must advise a defendant that, in addition to other rights, he has the right to remain silent and the right to counsel. 384 U.S. at 467–72, 86 S.Ct. at 1624–27, 16 L.Ed.2d at 719–22. "The right to counsel established in *Miranda* was one of a 'series of recommended "procedural safeguards" ... [that] were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected.' " *Davis v. United States,* —— U.S. ——, ——, 114 S.Ct. 2350, 2354, 129 L.Ed.2d 362, 370 (1994), *quoting Michigan v. Tucker,* 417 U.S. 433, 443–44, 94 S.Ct. 2357, 2363–64, 41 L.Ed.2d 182, 192–93 (1974). The Supreme Court added another layer to that protection in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and its progeny, by holding that once a defendant invokes his right to an attorney under *Miranda,* the defendant must reinitiate contact in order for the authorities to resume interrogation. "It remains clear, however, that this prohibition on further questioning—like other aspects of *Miranda*—is not itself

required by the Fifth Amendment's prohibition on coerced confessions, but is instead justified only by reference to its prophylactic purpose." *Connecticut v. Barrett,* 479 U.S. 523, 528, 107 S.Ct. 828, 832, 93 L.Ed.2d 920, 928 (1987).

Both sides to this appeal agree with the legal principle that, once a suspect invokes the right to counsel during custodial interrogation, all questioning must cease "until an attorney is present." *Miranda,* 384 U.S. at 474, 86 S.Ct. at 1628, 16 L.Ed.2d at 723. The parties also agree that in *Edwards v. Arizona, supra,* the Supreme Court established a bright-line rule to be used when a court is confronted with the issue regarding the waiver of the right to counsel by a suspect after having initially invoked his right to have counsel present. The controlling principle is succinctly stated in *Edwards:*

> "[A]dditional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversation with the police." 451 U.S. at 484–85, 101 S.Ct. at 1884–85, 68 L.Ed.2d at 386.

Thus, the question presented to this Court for resolution is whether the defendant invoked his right to have counsel present during custodial interrogation. We know from *Edwards* the initial inquiry must be whether the statement is a clear and unequivocal request to have counsel present.[6] If it is,

---

**6.** In *McNeil v. Wisconsin,* 501 U.S. 171, 178, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158, 168–69 (1991), the Supreme Court stated:

> "The rule of ... [*Edwards* ] applies only when the suspect 'ha[s] *expressed* ' his wish for *the particular sort of lawyerly assistance that is the*

*subject of Miranda. . . .* It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police.*" (Citation omitted; some emphasis added).

*Edwards* applies and the confession issue will be decided according to the terms of that opinion. The much harder issue, and the one relevant here, is what to do when the request is not sufficiently clear to invoke the *Edwards* rule. Unfortunately, courts around the country have "developed conflicting standards for determining the consequences of such ambiguities." *Smith v. Illinois,* 469 U.S. 91, 95, 105 S.Ct. 490, 493, 83 L.Ed.2d 488, 494 (1984) (per curiam).

There are three basic approaches courts in other jurisdictions have employed when evaluating ambiguous requests for counsel. The first approach does not require a cessation of questioning if a defendant's statements are equivocal. *See Golden v. State,* 439 So.2d 813 (Ala.Crim.App.1983); *State v. Eastlack,* 180 Ariz. 243, 883 P.2d 999 (1994); *Lara v. State,* 740 S.W.2d 823 (Tex.App.1987). The second approach requires police officers to ask clarifying questions when a defendant makes ambiguous comments about counsel. *See People v. Turnage,* 45 Cal.App.3d 201, 119 Cal.Rptr. 237 (1975); *Martinez v. State,* 564 So.2d 1071 (Fla.1990); *State v. Hoey,* 77 Hawai'i 17, 881 P.2d 504 (1994); *Commonwealth v. Waggoner,* 373 Pa.Super. 23, 540 A.2d 280 (1988), *appeal denied,* 520 Pa. 616, 554 A.2d 509, *cert. denied sub nom., Pennsylvania v. Waggoner,* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989); The third approach requires a cessation of all questioning following even an equivocal request for counsel. *See State v. Kunkel,* 137 Wis.2d 172, 404 N.W.2d 69, *review denied,* 138 Wis.2d 531, 412 N.W.2d 893, *cert. denied sub nom., Kunkel v. Wisconsin,* 484 U.S. 929, 108 S.Ct. 297, 98 L.Ed.2d 256 (1987); *Micale v. State,* 76 Wis.2d 370, 251 N.W.2d 458 (1977).

The United States Supreme Court in *Davis v. United States,* —— U.S. at ——, 114 S.Ct. at 2355, 129 L.Ed.2d at 371, after reviewing the various approaches, sided with the first approach by setting a "threshold" requirement of clarity:

> "Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' ... But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." (Citations omitted; emphasis in original).

In *Davis,* the majority refused to create another layer of "prophylaxis to prevent police questioning when the suspect *might* want a lawyer" out of fear that further extension of the *Edwards* principles would compromise effective police techniques. —— U.S. at ——, 114 S.Ct. at 2357, 129 L.Ed.2d at 373. (Emphasis in original). Although recognizing that some inarticulate defendants might suffer, the majority felt a suspect's greatest protection was the *Miranda* warnings themselves.

We applied the *Davis* principles to equivocal requests to cease questioning in *State v. Farley, supra,* by holding that a suspect's request to cease questioning must be clear and unequivocal. However, we reserved the question of whether equivocal statements could sufficiently raise a suspect's right to counsel under *Miranda.*[7]

---

7. This case does not require us to decide the above question, and we decline to determine whether the *Davis* principles should be extended to cases involving ambiguous requests for counsel. We do observe that our prior decision in *State v. Clawson,* 165 W.Va. 588, 270 S.E.2d 659 (1980), *receded from by Wilt v. Buracker,* 191 W.Va. 39, 443 S.E.2d 196 (1993), suggested further clarifying questions may be asked when a defendant is equivocal about the desire for counsel. We believe the clarifying question approach, as was suggested in *Clawson* and followed by the police in the present case, is sufficiently proper to balance the competing interests of legitimate governmental investigation and the inarticulate defendant. Obviously, this Court does not want to punish defendants "who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel[.]" *Davis v. United States,* —— U.S. at ——, 114 S.Ct. at 2356, 129 L.Ed.2d at 372. Permitting officers to clarify whether a defendant's vague statements are actual requests for counsel gives the officers sufficient leeway to make the decision about proper questioning techniques in individual cases at the time the issue arises.

As suggested above, the *Miranda* right to counsel has no applicability outside the context of custodial interrogation.[8] Therefore, until the defendant was taken into custody, any effort on his part to invoke his *Miranda* rights was, legally speaking, an empty gesture. We believe the "window of opportunity" for the assertion of *Miranda* rights comes into existence only when that right is available. The Supreme Court in note 3 of *McNeil v. Wisconsin*, 501 U.S. 171, 182, 111 S.Ct. 2204, 2211, 115 L.Ed.2d 158, 171 (1991), stated:

> "We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation'—which a preliminary hearing will not always, or even usually involve.... If the *Miranda* right to counsel can be invoked at a preliminary hearing, it could be argued, there is no logical reason why it could not be invoked by a letter prior to arrest, or indeed even prior to identification as a suspect. Most rights must be asserted when the government seeks to take the action they protect against." (Citations omitted).

Clearly, the decision in *McNeil* directly overrules any suggestion to the contrary.[9] To the extent that any of our prior cases could be read to allow a defendant to invoke his *Miranda* rights outside the context of custodial interrogation, the decisions are no longer of precedential value. As the Supreme Court recognized in *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 307 (1980), "[i]t is clear ... the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." We believe the same reasoning applies where a defendant is being interrogated, but he is not in custody. The "inherent compulsion" that is brought about by the *combination* of custody and interrogation is crucial for the attachment of *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 725–26.

Our refusal to extend the *Miranda/Edwards* protections to noncustodial interrogation is consistent with the goals of *Miranda*, which allow the police to conduct effective criminal investigations and at the same time provide a defendant an opportunity to dissipate the compulsion. By not allowing a defendant to anticipatorily invoke his *Miranda* rights, we do not intend to place an arduous burden on a defendant. We hold that where police have given *Miranda* warnings outside the context of custodial interrogation, these warnings must be repeated once custodial interrogation begins. Absent an effective waiver of these rights, interrogation must cease. Thus, there is no concern that our holding regarding the inapplicability of *Miranda* rights outside the context of custodial interrogation will allow law enforcement officials to badger a defendant in ways *Edwards* was meant to protect against.

In reviewing the video tape, we find *Miranda* warnings were in fact repeated once the defendant was taken into custody. The defendant also signed a written waiver

---

8. There are a few instances prior to the custodial interrogation where the defendant's statements could possibly be construed as requests for counsel. For example, at 12:29 p.m., the defendant stated: "Well probably what supposed to ask a lawyer or something but I really don't trust them."

9. The defendant apparently argues the *Miranda* right to counsel attaches when *Miranda* warnings are given irrespective of whether he is in custody. Some support for this position may be gleaned from note 10 in *State v. Farley*, 192 W.Va. at 252, 452 S.E.2d at 57, and note 3 in *State v. Jones*, 193 W.Va. 378, 381, 456 S.E.2d 459, 462 (1995). These cases were intended to suggest under special circumstances that *Mirandizing* a defendant could create a situation where the failure to honor those rights could create such a state of confusion that a defendant might reasonably believe even his right to leave has been changed. *See United States v. Obasa*, 15 F.3d 603 (6th Cir.1994) (*Miranda* warnings are necessary only prior to custodial interrogation; the issuance of *Miranda* warnings may transform a legal *Terry* stop into an illegal arrest). Absent these unique circumstances, which obviously are not present here, we believe the great weight of authority in this country is that a suspect may not invoke his *Miranda* right to counsel outside the context of custodial interrogation. *See United States v. Thompson*, 35 F.3d 100 (2nd Cir. 1994); *Alston v. Redman*, 34 F.3d 1237 (3rd Cir.1994), *cert. denied*, — U.S. ——, 115 S.Ct. 1122, 130 L.Ed.2d 1085 (1995); *United States v. LaGrone*, 43 F.3d 332 (7th Cir.1994).

of rights form. Immediately after the giving of *Miranda* warnings and the signing of the written waiver, the following conversation took place:

"[Officer Curry:] It's pretty obvious what happened. But, like I said, we know you shot them but what we need to know is why. That's what we need to know. Can you tell me why, can you tell me why it happened? Can you tell me why?

"[Defendant:] No comment. And besides that what difference would why make any difference, what difference would why make?

[—Officer Curry then tells the defendant that "why" is important.]

"[Officer Curry:] Now what happened at that store last night. Did something happen that was spontaneous you lost control? Or did you go there with the intentions of shooting them?

"[Defendant:] No comment. *I'm not sure if I should even be going this far with you without a lawyer.* I know your intentions might be good o.k.—but—

\*    \*    \*    \*    \*    \*

"[Officer Curry:] My intentions is trying to find out why this thing happened.... Let me back up a second. *You said at this point you're not even sure that you should go on without a lawyer—Well, you know, I advised you of your rights, okay? And you understand that any time you want to stop talking to me—you can say 'Kerry, I don't want to talk to you any more.' Okay?* and I'll understand that but we have a situation that we have to get resolved here.... I need to know if you went there with an intention to shoot these people or did something happen when you went there and this was spontaneous action.

"[Defendant:] No comment." (Emphasis added).

After the defendant made an oral statement, the police again attempted to make sure the defendant understood his rights:

"[Officer Curry:] *You understood everything I told you about your rights. Did you understand all that....*

"[Defendant:] *Yeah, we got that all squared away.*

"[Officer Curry:] You know at anytime you didn't want to talk you could've stopped me. You didn't have to talk to me ... but you chose to keep on talking to me.

"[Defendant:] Yeah." (Emphasis added).

Lieutenant Curry then asked the defendant if he can put the defendant's statement into writing. The defendant is told he does not have to have the statement put into writing. The defendant responds as follows:

"[Defendant:] If I don't do this, I mean as far as my story, that's the way it is there's no point in changing it or nothing but would a lawyer doing this or being with me here to do this or something benefit me in any way?

"[Officer Curry:] Like we told you from the start, okay? *You can have an attorney with you if you want an attorney, if you cannot afford one, the court will appoint one for you. We've told you that about the lawyers three times.* We also went over the part about, you know, if you wanted to talk to us and answer our questions, at any time you decided you wanted to stop, you could stop. So, this is something—this is a decision you have to make." (Emphasis added).

In *Hoey*, the Supreme Court of Hawaii decided that when a suspect makes equivocal statements about counsel, the police must either cease questioning or ask clarifying questions. The questioning can only continue if, after clarification, the suspect "voluntarily, knowingly, and intelligently waives the presence of counsel." 77 Hawai'i at 17, 881 P.2d at 523. The *Hoey* court specifically adopted the reasoning of Justice Souter in his concurring opinion in *Davis* that clarifying questions fulfilled real world realities without sacrificing police technique.

We do not believe the "clear and unequivocal request for counsel" rule of *Edwards* was met by the defendant and any *Miranda*-triggered request for counsel would only, at the very best, be an ambiguous request under the circumstances. While we have sub-

stantial doubts whether a reasonable officer would believe the defendant was or had any intention of invoking his right to have counsel present, we believe the police made adequate efforts under both *Davis* and *Hoey* to clarify the attorney dilemma. Simply stated, there can be no violation of the rights protected by *Miranda/Edwards* where, when facing an ambiguous request for counsel, the police remind the defendant of his *Miranda* rights and specifically his right to have counsel present. In note 5 of *United States v. LaGrone,* 43 F.3d 332, 337 (7th Cir.1994), the circuit court of appeals dealt with identical circumstances:

"Even if we were to believe that subjectively LaGrone may have been attempting to invoke his *Miranda* right to counsel, he did so, at best, ambiguously under the circumstances. The majority in *Davis* stated that if the defendant makes an equivocal or ambiguous request for counsel, the police may, in effect, ignore it and continue interrogating; they need not clear up the ambiguity. *Davis,* —— U.S. at ——, 114 S.Ct. at 2356[, 129 L.Ed.2d at 372–73]. Thus, LaGrone could not have complained had he been interrogated without an attempt by the officers to determine whether he wanted an attorney present at interrogation. Four justices disagreed with the majority, believing that the authorities must make some effort to determine whether the defendant was in fact trying to invoke his right to counsel under *Miranda. Id.* at ——, 114 S.Ct. at 2359[, 129 L.Ed.2d at 374–75]. *But the officers' conduct in this case meets even this higher standard. Before questioning him at the station, LaGrone was again read his Miranda rights, and he waived them. This surely cleared up any ambiguity.* Thus, the authorities went beyond what the Court in *Davis* required of them." (Emphasis added).

We find the analysis in *LaGrone* to be forceful. By reminding the defendant of his *Miranda* rights and giving him an adequate opportunity to explicitly invoke his right to counsel, the police removed any ambiguity as to the defendant's right to have counsel present during interrogation. Thus, the police conduct was sufficient to meet even the higher standard of *Hoey.*

The defendant's assertions cannot be judged in isolation from the surrounding facts. The defendant was read and explained his *Miranda* rights four times and signed a waiver of rights form three times signifying those choices. Thus, the right to counsel was either read or explained to him a total of seven times. Furthermore, the police at times asked clarifying-type questions. We find under the totality of the circumstances the police officers did nothing to trammel on the rights of the defendant, including his right to have counsel present during the interrogation. We have no doubt the defendant clearly understood his right to counsel, but waived that right four times, three of which were in writing. While the defendant may have been influenced by the interrogation tactics of the officers, the interrogation was not so compelling or coercive that he was unable to consider his options and exercise his freewill.

In conclusion, the evidence indicates the officers did not violate the defendant's Fifth Amendment right to counsel, and the trial court did not err in admitting Lieutenant Curry's testimony about the confession in both trials and in admitting the video-taped confession in the second trial.

### 2. Right to Remain Silent

The second part of the defendant's argument under this assignment of error is that the aforementioned testimony and certain physical evidence should have been excluded because he invoked his Fifth Amendment right to remain silent during the interrogation. However, the State counters by asserting the defendant waived his *Miranda* rights and voluntarily confessed to the police. After reviewing the video tapes, it is clear the defendant never specifically stated he wanted to remain silent.[10] The defendant asserts that his previously discussed ambiguous statements were not only requests for coun-

---

**10.** See Section 1, *supra,* discussing the right to counsel for a full review of the defendant's state-

ments during the police interrogation.

sel, but also assertions of his right to remain silent. Thus, we are asked to determine whether certain ambiguous statements made by the defendant constitute an invocation of the defendant's Fifth Amendment right to remain silent.

■ In Syllabus Point 4 of *State v. Farley, supra,* we addressed the issue of ambiguous requests to cease questioning and noted:

> " ' "Once a person under interrogation has exercised the right to remain silent, guaranteed by *W.Va. Const.,* art. III § 5, and *U.S. Const.* amend. V, the police must scrupulously honor that privilege. The failure to do so renders subsequent statements inadmissible at trial." Syllabus Point 3, *State v. Rissler,* 165 W.Va. 640, 270 S.E.2d 778 (1980).' Syllabus Point 1, *State v. Woodson,* 181 W.Va. 325, 382 S.E.2d 519 (1989)."

■ When a defendant asserts his right to remain silent, all questioning must stop. However, a defendant's Fifth Amendment assertion to cease questioning must be clear and unequivocal. In fact, in Syllabus Point 5 of *Farley,* we stated:

> "To assert the *Miranda* right to terminate police interrogation, the words or conduct must be explicitly clear that the suspect wishes to terminate all questioning and not merely a desire not to comment on or answer a particular question."

As stated previously, we adopted part of the United States Supreme Court's decision of *Davis v. United States, supra,* in *Farley* to establish the principle that any doubt created by ambiguous statements of a defendant's desire to end an interrogation would be resolved in favor of the police. 192 W.Va. at 256, 452 S.E.2d at 59.

■ We think the question raised here is answered definitively by *Farley* in that, after reviewing the video tapes and the defendant's contentions, it is evident the present case clearly fits within *Farley*'s holding. The defendant never clearly invoked his right to remain silent. Moreover, it is difficult to argue that any portion of the defendant's comments during the interrogation was even an equivocal request to remain silent. The only comments that could be even marginally viewed as a request to cease questioning were when the defendant responded to questions during the interrogation by stating "No comment" and "I can't say." Phrases like "No comment" and "I can't say" have no real content and, thus, cannot be viewed as an unequivocal assertion of Fifth Amendment rights.

As discussed in *Farley,* a defendant must clearly indicate he wants to cease all questioning and is not simply refusing to discuss certain questions. "No comment" and "I can't say" in the context of the questioning seem question specific for the purposes of a Fifth Amendment right-to-silence analysis. A reasonable person could not determine from the defendant's ambiguous statements that the defendant might be attempting to assert his right to silence. Since it is clear there is an ambiguity in this case, the ambiguity will be decided in favor of the police. *See State v. Farley,* 192 W.Va. at 254, 452 S.E.2d at 59. Thus, the trial court did not err in finding there were no Fifth Amendment violations.

Our determination is bolstered by the fact the defendant was read his *Miranda* rights four times and signed a waiver of rights forms. Furthermore, the previously discussed clarifying questions of the police officers specifically informed the defendant he was under no obligation to continue speaking and the defendant stated he understood his rights. Under these circumstances, the police did not violate the defendant's Fifth Amendment right to silence. Therefore, we reaffirm our holding in *Farley* and find equivocal or ambiguous statements by a defendant are insufficient to invoke a defendant's right to silence and an officer's failure to cease questioning under these circumstances does not violate a defendant's right to silence. Accordingly, the trial court did not err when it found the defendant's Fifth Amendment rights were not violated during the police interrogation.

### B.

### *Voluntariness of the Confession*

In addition to the purported *Miranda* violations, the defendant asserts the video-taped confession should not have been admitted at

the second trial because the police coerced his confession.[11] The defendant claims the investigatory techniques of the officers "foment[ed] hope and despair in the mind of the defendant." After reviewing the trial transcripts and relevant case law, we find the trial court did not err in admitting the video tapes over the defendant's objection challenging the voluntariness of the defendant's confession.[12]

When evaluating the voluntariness of a confession, a determination must be made as to "whether the defendant knowingly and intelligently waived his constitutional rights" and whether "'the confession ... [was] the product of an essentially free and unconstrained choice by its maker.'" *State v. Slaman*, 189 W.Va. at 300, 431 S.E.2d at 94, *quoting State ex rel. Williams v. Narick*, 164 W.Va. 632, 636, 264 S.E.2d 851, 855 (1980). In *Slaman, supra*, this Court implicitly acknowledged "[t]he question of the voluntariness of a waiver of *Miranda* rights is separate and differs from the determination of the voluntariness of a confession." *Smith v. Duckworth*, 856 F.2d 909, 911 (7th Cir. 1988).[13] Furthermore, in *State v. Farley, supra*, we espoused a new standard for determining whether representations or promises invalidate a confession. Overruling a prior series of cases, we specifically held in Syllabus Point 7, in part, of *Farley, supra*:

"Representations or promises made to a defendant by one in authority do not necessarily invalidate a subsequent confession. In determining the voluntariness of a confession, the trial court must assess the totality of all the surrounding circumstances. No one factor is determinative."

Furthermore, in Syllabus Point 6, we stated:

"'Misrepresentations made to a defendant or other deceptive practices by police officers will not necessarily invalidate a confession unless they are shown to have affected its voluntariness or reliability.' Syllabus Point 6, *State v. Worley*, 179 W.Va. 403, 369 S.E.2d 706 (1988)."

The defendant argues the Cincinnati Airport police coerced him into making a confession as a result of their investigative techniques. Prior case law indicates some important factors bearing on voluntariness include actual threats or physical intimidation, mental coercion, the length and form of confinement, deceptions, inducements, and/or other forms of psychological pressure. However, under *Farley*, no single factor was considered determinative. The defendant here asserts he was induced to make a statement because of the length of time of the questioning, the physical proximity of the questioner to the defendant, inducements, and other psychological pressure by the officers.

It is axiomatic that prolonged confinement by itself does not establish coercive police conduct. However, prolonged *incommunicado* interrogation is one factor for consideration under the totality of the circumstances. *See State v. Sprouse*, 169 W.Va. 719, 289 S.E.2d 228 (1982) (*per curiam*) (finding defendant's statement was coerced based on the fact the police not only interrogated the defendant for an extended period of time at night, but the officers knowingly used the defendant's mental and physical conditions to coerce his confession). Additionally, evidence of mental or physical coercion or the absence of necessities are also factors bearing on voluntariness. However, this case is not the type of night-time *incommunicado* interrogation situation contemplat-

---

**11.** Appropriately, the defendant relies on the same issues and evidence developed at the motion to suppress for the first trial for both appeals. Prior to the second trial, the trial court stated that "[a]nything that was in the other case—any of the pre-trial motions on the other case that this Court ruled upon, even though this is the second trial, anything in the first trial will revert back. In other words, you have the benefit of the record from both trials." Therefore, on appellate review, any motions made by defense counsel during the first trial will be treated as if made for the second trial.

**12.** The issue of prompt presentment also was raised on appeal. However, because the record was inadequately developed, we find the defendant waived this issue for appellate review purposes.

**13.** *See State v. Smith*, 186 W.Va. 33, 410 S.E.2d 269 (1991) (confessions may be involuntary in law and involuntary in fact); *State v. Goff*, 169 W.Va. 778, 289 S.E.2d 473 (1982) (since *Miranda*, the term "voluntary" has two levels of meaning).

ed by *Sprouse*, nor has the defendant in this case shown that his six hours of questioning adversely affected him or that he had special mental or physical conditions the police exploited to force a confession.[14] It is clear from the video tape that there were breaks in the questioning and the police officers did not deprive the defendant of any necessities.

■ The defendant also asserts that statements such as " 'let's clear this up' for the folks back home" induced him to confess. We have addressed the effects of inducements on a defendant in a number of cases.[15] Overall, these cases have a common and central theme: this Court only will find a confession invalid if the statements of the authorities promised some specific form of leniency, the defendant reasonably believed the promise could be carried out, and/or the defendant's mental freedom was overcome. *See* I Franklin D. Cleckley, *Handbook on West Virginia Criminal Procedure*, Chap. V § C(1)(g) at I–418–19 (1993). The defendant admits the statements of the police were so ambiguous he could not "tell what the police meant." We do not believe comments by police officers that are so ambiguous and inconsequential, as they are in this case, could have induced an involuntary confession.

■ The defendant also contends certain comments by police officers such as "God knowing the truth about the incident" generated despair. Although confessions obtained by inducing a defendant to confess "carry a stigma of unconstitutionality," *State ex rel. Burton v. Whyte*, 163 W.Va. 276, 282, 256 S.E.2d 424, 428 (1979), mere adjurations to speak the truth are not a form of intimidation that would invalidate an otherwise lawful confession. *See State v. Casdorph*,

159 W.Va. 909, 230 S.E.2d 476 (1976), *receded from by State v. Persinger*, 169 W.Va. 121, 286 S.E.2d 261 (1982); *State v. Mayle*, 108 W.Va. 681, 152 S.E. 633 (1930). *But cf. State v. Burgess, supra*.

■ As we stated in *Farley*, there is nothing inherently wrong with an officer attempting to create a favorable climate for confession by attempting to strike an emotional chord with the defendant, which is all that was done here. *See, e.g., Bryant v. Vose*, 785 F.2d 364, 368 (1st Cir.), *cert. denied*, 477 U.S. 907, 106 S.Ct. 3281, 91 L.Ed.2d 570 (1986) (confession voluntary even if motivated by police chief's observations that triggered emotional response of sorrow and remorse in suspect); *United States v. Rojas–Martinez*, 968 F.2d 415, 418 (5th Cir.), *cert. denied sub nom., Michel v. United States*, —— U.S. ——, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992), *cert. denied sub nom., Casas–Acevedo v. United States*, —— U.S. ——, 113 S.Ct. 995, 122 L.Ed.2d 146 (1993) ("[e]xpressions of sympathy by an officer are not [impermissibly] coercive"); *Hawkins v. Lynaugh*, 844 F.2d 1132, 1140 (5th Cir.), *cert. denied*, 488 U.S. 900, 109 S.Ct. 247, 102 L.Ed.2d 236 (1988) ("interviewer's efforts to invoke emotional response, standing alone, not offensive to due process", *quoting United States v. Barlow*, 41 F.3d 935, 944 n. 6 (5th Cir.1994), commenting on *Hawkins v. Lynaugh* ). Similarly, a defendant's confession is not involuntary merely because it was made once the defendant finally confronted the dire consequences that flowed from his previous criminal conduct. *United States v. Barlow*, 41 F.3d at 944 n. 26.

After examining the totality of the circumstances, we hold there was sufficient evi-

---

**14.** Additionally, the actual length of confinement is questionable considering the defendant was not under arrest until a few hours into the questioning. Therefore, the defendant was not in custody and could have attempted to leave if he wanted.

**15.** *See State v. Stotler*, 168 W.Va. 8, 282 S.E.2d 255 (1981) (defendant induced to confess after police told him his children would end up in foster care and his wife would remain in jail if he refused to confess); *State v. Burgess*, 174 W.Va. 784, 786, 329 S.E.2d 856, 858 (1985) (promises of a police officer that the defendant might get a

lighter sentence and that it would look better to the court were "designed to foment hope in the mind of the defendant" and, thus, made the defendant's confession involuntary); *State ex rel. Justice v. Allen*, 189 W.Va. 437, 432 S.E.2d 199 (1993) (defendant's statement was involuntary after he was promised grant of immunity from prosecution). *But cf. State v. Casdorph*, 159 W.Va. 909, 230 S.E.2d 476 (1976) (vague promises of help and encouraging a confession did not invalidate confession), *receded from by State v. Persinger*, 169 W.Va. 121, 139, 286 S.E.2d 261, 272 (1982); *State v. Slaman, supra*.

dence in the record to support a finding that the defendant's confession was voluntary. Accordingly, the trial court's admission of the video tape was not error on this ground.

## III.

### SPOUSAL IMMUNITY

The defendant's next assignment of error is that his arrest and all evidence obtained after questioning should have been inadmissible because they were derived from confidential communication between spouses. Additionally, the defendant argues that "privileged communication between husband and wife is not admissible in the case against the defendant."

■■ West Virginia recognizes two marital privileges: the spousal testimony privilege and the marital confidence privilege. The two are distinct and must be analyzed separately.[16] The spousal testimony privilege is much broader than the marital confidence privilege in that it bars all adverse testimony; whereas, the marital confidence privilege applies only to confidential communications and can be asserted even after the dissolution of the marriage. On the other hand, the spousal testimony privilege is narrower than the marital confidence privilege in that it applies only to criminal proceedings and can be asserted only during the marriage.

■■ W.Va.Code, 57–3–3 (1923),[17] prohibits a witness spouse from being compelled or allowed to testify without the consent of the defendant spouse in a criminal case. Furthermore, W.Va.Code 57–3–4 (1923),[18] does not permit a spouse to testify about confidential communications without the permission of the other spouse. Thus, the defendant is absolutely correct in his assessment that a trial court may not permit a defendant's spouse to be called as a prosecution witness nor allow a spouse to testify to any confidential communications. However, calling a spouse in violation of the aforementioned Code sections does not automatically mean reversible error results. *See State v. Bailey*, 179 W.Va. 1, 365 S.E.2d 46 (1987) (violations of these sections are subject to harmless error analysis). We review the trial court's rulings on the admission of evidence under an abuse of discretion standard.

### A.

### *Marital Confidence Privilege*

■■ The marital confidence privilege prevents compelled disclosure of confidential communications made between spouses during the course of their marriage. The test for determining whether acts or conduct of a spouse constitutes confidential communication is "whether the act or conduct was induced by or done in reliance on the confidence of the marital relation, i.e., whether there was an expectation of confidentiality." Syl. pt. 2, in part, *State v. Robinson*, 180 W.Va. 400, 376 S.E.2d 606 (1988). Furthermore, there is a presumption that all commu-

16. This distinction is significant: (1) the privilege against adverse spousal testimony prevents a person from being compelled to testify against his or her spouse (this privilege is held by the defendant's spouse), and (2) the marital confidence privilege, sometimes referred to as the "marital communication" privilege, protects information disclosed between husband and wife in the confidence of the marital relationship (this privilege is held by either spouse).

17. W.Va.Code, 57–3–3, reads as follows:

"**§ 57–3–3. Testimony of husband and wife in criminal cases.**

"In criminal cases husband and wife shall be allowed, and, subject to the rules of evidence governing other witnesses, may be compelled to testify in behalf of each other, but neither shall be compelled, nor, without the consent of the other, allowed to be called as a witness against the other except in the case of a prosecution for an offense committed by one against the other, or against the child, father, mother, sister or brother of either of them. The failure of either husband or wife to testify, however, shall create no presumption against the accused, nor be the subject of any comment before the court or jury by anyone."

18. W.Va.Code, 57–3–4, reads as follows:

"**§ 57–3–4. Confidential communications between husband and wife.**

"Neither husband nor wife shall, without the consent of the other, be examined in any case as to any confidential communication made by one to the other while married, nor shall either be permitted, without such consent, to reveal in testimony after the marriage relation ceases any such communication made while the marriage existed."

nication between spouses is confidential. *State v. Robinson, supra.* However, even with these rigorous protections of the marital relationship, it is still questionable whether Mrs. Bradshaw divulged any confidential communications in her testimony. Mrs. Bradshaw's testimony consisted of general comments about family life, which airport she left her husband, his supposed travel plans, and what he was wearing.

■ The trial court specifically held that testimony concerning the defendant's whereabouts was not within the privilege. The trial court's decision was based on its belief the defendant's wife could testify to anything that could be observed by other people. After *Robinson*, it is clear that observable acts fit within the spousal privilege. However, we agree with the trial court. The marital confidence privilege applies only to communications that are confidential. Communications made in the known presence of third parties or intended to be disclosed to others are outside the privilege. *Nash v. Fidelity–Phenix Fire Ins. Co.*, 106 W.Va. 672, 146 S.E. 726 (1929). This decision is a logical extension of prior case law where we held the privilege did not cover certain communication because it occurred in the presence of a third party. *State v. Richards*, 182 W.Va. 664, 391 S.E.2d 354 (1990); *Fuller v. Fuller*, 100 W.Va. 309, 130 S.E. 270 (1925).

The trial court's ruling that the defendant's actions were not meant to be confidential is well supported by the evidence. Although confidentiality is presumed and it is incumbent upon the State to prove otherwise, several factors indicate the defendant's acts and communication were not done in reliance on the marital relationship. For example, the fact that the defendant admitted to lying to his wife concerning his travel plans and to his marriage being very weak adequately demonstrates the absence of reliance.[19] Under these circumstances, we do not find the trial court abused its discretion in admitting Mrs. Bradshaw's testimony concerning her observations of the defendant's purely public behavior.[20]

### B.

### *Spousal Testimony Privilege*

The defendant argues that reversible error was committed when the trial court permitted his wife to be called as a witness for the prosecution. The State contends the defendant did not seriously object to his wife's testifying because most of her testimony was beneficial to him. In any event, the State urges us to hold that any error under this assignment was harmless.

■ There can be no question that W.Va.Code, 57–3–3, absolutely prohibits the spouse of a criminal defendant from testifying against the defendant, except where the

19. The state of a marital relationship may be a relevant consideration in determining reliance on the marital relationship, but we do not mean to infer that a weak marital relationship is *per se* evidence that there has been no privileged communication or that the State has been relieved of its burden to prove the absence of reliance. Courts should not make subjective determinations based on the health of the marriage. *See generally* Note, *"Honey, the Judge Says We're History": Abrogating the Marital Privileges via Modern Doctrines of Marital Worthiness*, 77 Cornell L.Rev. 843 (1992).

20. In *Wolfle v. United States*, 291 U.S. 7, 14, 54 S.Ct. 279, 280, 78 L.Ed. 617, 620 (1934), the United States Supreme Court addressed this very issue:

"Communications between the spouses, privately made, are generally assumed to have been intended to be confidential, and hence they are privileged; but whenever a communi-

cation, because of its nature or the circumstances under which it was made, was obviously not intended to be confidential it is not a privileged communication.... And, when made in the presence of a third party, such communications are usually regarded as not privileged because not made in confidence." (Citations omitted).

This Court consistently has suggested that spousal privileges should be restricted not enlarged. *See State v. Bailey*, 179 W.Va. at 3–4, 365 S.E.2d at 48–49, *quoting Wells v. Commonwealth*, 562 S.W.2d 622, 624 (Ky.), *cert. denied sub nom. Wells v. Kentucky*, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978) (the privilege " 'is one of the most ill-founded precepts to be founded by common-law. It is enough that it continues to exist at all. When it is encountered it is better to be trimmed than enlarged' "). Even if admitting Mrs. Bradshaw's testimony was error, it was harmless error considering there was substantial evidence supporting the defendant's conviction without her testimony.

defendant is charged with a crime against the person or property of the other spouse or certain other relatives.[21] Where properly invoked, this statute precludes all adverse testimony by a spouse, not merely disclosure of confidential communications. This spousal protection applies only to legally recognized marriages and lasts only as long as the legal marriage exists. *State v. Evans*, 172 W.Va. 810, 310 S.E.2d 877 (1983); *State v. Evans*, 170 W.Va. 3, 287 S.E.2d 922 (1982). Because it appears the defendant and his wife were divorced at the time of the second trial, this statute did not bar her testimony in that trial.[22]

We find the plain mandate of W.Va.Code, 57-3-3, was violated in the first trial. Thus, the only issue for us to consider is whether the defendant waived or forfeited his protections under the statute or whether the violation constituted reversible error. After a careful review of the entire record in the first trial, we find that objection to his wife's testimony under W.Va.Code, 57-3-3, was sufficiently preserved, but the violation constituted harmless error only.

■■■ As authorized by Rule 103(c) of the West Virginia Rules of Evidence, the defendant by a pretrial motion *in limine* sought to bar the prosecution from calling his wife as a witness.[23] At the hearings on March 3, 1993, and March 22, 1993, approximately two months before the first trial, the defendant cited W.Va.Code, 57-3-3, as supporting authority for his objection. Because this statute deals only with one subject, we find that merely citing it is enough to meet the specificity requirements of Rule 103(a)(1).[24] We further find that under the rule we adopted in Syllabus Point 1 of *Wimer v. Hinkle*, 180 W.Va. 660, 379 S.E.2d 383 (1989), the ruling made by the trial court on the *in limine* motion was sufficient to preserve the issue for appellate review:

"An objection to an adverse ruling on a motion in limine to bar evidence at trial will preserve the point, even though no objection was made at the time the evidence was offered, unless there has been a significant change in the basis for admitting the evidence."

The State does not argue nor do we find any significant or subsequent changes affecting the "basis for admitting the evidence." To the contrary, the State asks us to hold the pretrial objection was not seriously pursued. Unfortunately for the State, the West Virginia Rules of Evidence do not require a serious objection. Rule 103(a) merely requires the objection be specific and timely. We find these requirements were met. "Certainly, a *strenuous* objection is not required to preserve error." *Shia v. Chvasta*, 180 W.Va. 510, 513, 377 S.E.2d 644, 647 (1988). (Emphasis in original).

■■■ The State argues alternatively that the error dealing with the wife's testimony was harmless error. We agree. Our conclusion that the circuit court erred does not end our inquiry. We must next ask whether the circuit court's erroneous admission of Mrs. Bradshaw's testimony prejudiced the outcome at trial or was otherwise harmless. *See* W.Va.R.Evid. 103(a) ("Error may not be predicated upon a ruling which admits . . .

21.  *See* note 17, *supra*, for the text of W.Va.Code, 57-3-3.

22.  The evidence suggests the defendant and his wife were divorced or at least in the process of divorcing by the time of the second trial. If the defendant and his wife were still married during the second trial, our decision here would apply with equal force to Mrs. Bradshaw's testimony in the second trial.

23.  Rule 103(c) of the Rules of Evidence provides:

"*Hearing of Jury.*—In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury. Where practicable, these matters should be determined upon a pretrial motion in limine."

24.  Rule 103(a)(1) of the Rules of Evidence provides:

"*Effect of Erroneous Ruling.*—Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
"(1) Objection.—In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.]"

evidence unless a substantial right of the party is affected").

■ As stated in the preceding section of this opinion, violations of W.Va.Code, 57–3–3, are subject to harmless error analysis. *State v. Bailey, supra; State v. Goad,* 177 W.Va. 582, 355 S.E.2d 371 (1987). The harmless error inquiry involves an assessment of the likelihood that the error affected the outcome of the trial. In the realm of nonconstitutional error, the appropriate test for harmlessness articulated by this Court in *State v. Atkins,* 163 W.Va. 502, 261 S.E.2d 55 (1979), *cert. denied,* 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980), is whether we can say with fair assurance, after stripping the erroneous evidence from the whole, that the remaining evidence independently was sufficient to support the verdict and that the judgment was not substantially swayed by the error.

The application of the harmless error test is fact specific, *see McDougal v. McCammon,* 193 W.Va. 229, 455 S.E.2d 788 (1995), depending upon the balance of the evidence bearing upon the issue which the error arguably affected and the centrality of that issue to the ultimate decision. The question must be asked whether the error itself had substantial influence. If so, or if one is left with grave doubt, the verdict cannot stand. In order to decide whether Mrs. Bradshaw's testimony was harmless error, we must evaluate her testimony in light of what the prosecution had to prove to convict the defendant.[25]

After reviewing the record, it is abundantly clear that nothing from Mrs. Bradshaw's testimony could have swayed the jury and that the remaining untainted evidence was sufficient to support the defendant's conviction. While Mrs. Bradshaw's testimony could possibly have had effect on the jury's weighing of the evidence, we can say with certainty that she did not have a substantial impact on the result of the trial. Initially, it is important to note that most of the critical evidence concerning the murder scene came from the defendant. Mrs. Bradshaw's testimony dealt with preliminary matters of the length of her marriage, the number of children she had with the defendant, their family life, and the defendant's employment during the spring of 1992. Her testimony also covered the events on the night of the murders.[26] However, Mrs. Bradshaw's testimony was in no way incriminating to the defendant. Additionally, most of Mrs. Bradshaw's testimony was corroborated by other witnesses, including the defendant. Furthermore, the defendant substantially benefitted from her testimony. During the cross-examination, Mrs. Bradshaw testified the defendant was a religious man, she had packed a well-worn Bible used frequently by the defendant and the defendant was a Sunday school teacher. Thus, there was no suggestion to the jury that she was in fact an adverse witness to the defendant.

Accordingly, because we cannot say that the error in this case had a " 'substantial and injurious effect or influence in determining the jury's verdict,' " *Brecht v. Abrahamson,* ——— U.S. ———, ———, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353, 363–64 (1993), *quoting Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557, 1572 (1946), we find the error in allowing Mrs. Bradshaw to testify as a prosecution witness was harmless and it would not serve the ends of justice to reverse these convictions on this ground.

---

**25.** In one of our prior cases, we held the spousal testimony privilege prohibits only adverse testimony of the spouse. In *State v. Jarrell,* 191 W.Va. 1, 5, 442 S.E.2d 223, 227 (1994), this Court stated:

"The marital privilege is not absolute. When the witness-spouse's testimony is not adverse to the defendant-spouse, such testimony does not necessarily fall within the protection of the marital privilege. Therefore, we conclude that the fact that ... [the defendant's wife's] grand jury testimony was read at her husband's trial does not warrant reversal in this instance."

We believe *Jarrell* is additional authority that the harmless error rule is appropriate in the present case.

**26.** Mrs. Bradshaw testified that the following occurred on the night of the murder: her brother arrived to babysit the children; the defendant returned home (presumably following the murders); she packed various items in the defendant's suitcases; she and the defendant went to the Mall and then to a hotel; and she dropped the defendant at the airport the following morning.

## C.

### *Extrajudicial Statements of Spouse*

Wrapped in the cloak of the "fruits of the poisonous tree" doctrine, the defendant's second contention is that the evidence derived from his wife's statements to the police should have been excluded because of the spousal privilege. Under this theory, the defendant argues Mrs. Bradshaw told the police his whereabouts because she was not informed of her right to refuse to assist the officers. The defendant further claims there would have been no arrest or confiscation of evidence without the assistance of Mrs. Bradshaw's statements. We find no merit to these arguments.

■ Initially, outside the context of custodial interrogation, we explicitly reject any legal rule that would require the police to give warnings to a spouse of a defendant regarding the spouse's privilege not to talk to the police. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (knowledge of right to consent not a controlling factor). Similarly, absent a constitutional violation, the "fruits of the poisonous tree" doctrine has no applicability. *See Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) (absent a constitutional violation, Court found inapposite principle of "poisonous tree"); *State v. Goodmon,* 170 W.Va. 123, 131, 290 S.E.2d 260, 268 (1981) ("poisonous tree" doctrine did not bar admission of knife where confession was found to be voluntary). Therefore, the only remaining issue before this Court is whether the extrajudicial statement of the defendant's spouse is admissible testimony.

■ Although the extent of the spousal testimony privilege is fairly liberal when it concerns the exclusion of in-court testimony, we have not held that the spousal privilege extends beyond the confines of the trial court's environment. In fact, we specifically stated in *State v. Bailey, supra,* that a spouse's statements to police during the course of an investigation are not protected by the marital privilege.[27] We reaffirm *Bailey* and hold that evidence derived from statements by a spouse to police during the course of an investigation do not fall within the marital privilege exclusion.[28]

## IV.

### CROSS–EXAMINATION

The defendant next contends the circuit court committed error by permitting the prosecution as part of its cross-examination to require the defendant to reenact the killings. Essentially, the defendant contends the trial court should not have required the defendant to participate in a reenactment at all and the error was compounded by the misleading nature in which the reenactment was staged. While there is some force to this argument, we believe on balance it is factually unsupported and legally unsound.

■ In applying Rule 611(b) of the West Virginia Rules of Evidence,[29] the circuit

---

**27.** There is a conflict among jurisdictions as to whether extrajudicial statements are excludable on the basis of spousal privilege. The majority rule, consistent with *Bailey,* holds the privilege applies only to testimony by the spouse and does block the admission of extrajudicial statements of one spouse offered against the other where such statements are admissible under the hearsay doctrine. *See, e.g., United States v. Tsinnijinnie,* 601 F.2d 1035, 1037–39 (9th Cir.1979), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1657, 64 L.Ed.2d 242 (1980) (marital privilege "should not be extended to bar a witness from relating an excited utterance by a spouse"); *United States v. Chapman,* 866 F.2d 1326, 1333 (11th Cir.), *cert. denied,* 493 U.S. 932, 110 S.Ct. 321, 107 L.Ed.2d 312 (1989) (spousal extrajudicial statements are not excludable on the basis of spousal privilege). The defendant did not preserve a hearsay objection. *See United States v. Hall,* 989 F.2d 711, 715–16 (4th Cir.1993) (where wife asserted privilege to refuse to testify against defendant, error for the prosecution to cross-examine defendant about "statement" wife allegedly made to prosecutor because such statement was inadmissible hearsay).

**28.** A different conclusion might be compelled where the evidence indicates the spouse of a defendant was coerced in some way to reveal incriminating information about a defendant. However, we decline to decide this issue now as there is no evidence that Mrs. Bradshaw was coerced in any way.

**29.** Rule 611(b) states:

> "*Scope of Cross–Examination.*
>
> "(1) Party Witness.—A party may be cross-examined on any matter relevant to any issue in the case, including credibility. In the inter-

court has considerable discretion to determine the proper scope of cross-examination, after weighing such factors as the importance of the evidence to the prosecution's case, the relevance of the conduct to the witness's truthfulness, and the danger of prejudice, confusion, or delay raised by the evidence sought to be adduced.[30] It is a well settled rule that a defendant who voluntarily offers himself as a witness and testifies in his own behalf subjects himself to legitimate and pertinent cross-examination to test his veracity and credibility. Thus, by deciding to testify in a West Virginia criminal trial, a defendant brings into play the rules designed to implement the truth-finding process, i.e., cross-examination.

■ This much the defendant concedes. He suggests the opportunity for cross-examination does not include the right to require a reenactment, especially when the reenactment has the potential to mislead the jury. The admission of demonstrative evidence rests largely within the trial court's discretion, and an appellate court will not interfere unless the trial court has abused that discretion. More specifically, demonstrative evidence in the nature of witness reenactment is admissible if it affords a reasonable inference on a point in issue.[31] This Court addressed this general issue in *State v. Clark*, 175 W.Va. 58, 63, 331 S.E.2d 496, 501 (1985), where we stated:

> est of justice, the judge may limit cross-examination with respect to matters not testified to on *direct examination*.
> "(2) Non–Party Witnesses.—Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the non-party witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination."

**30.** The common notion that trial courts have almost unlimited discretion to regulate the scope of cross-examination does not apply to a criminal defendant in West Virginia. Rule 611(b)(1) by its very terms encourages wide-open cross-examination when a party is a witness unless the defendant can demonstrate that literal application of the rule would create an unjust situation.

**31.** Under Rule 401 of the Rules of Evidence, "relevancy" is the tendency to make a conse-

"Nor do we find any merit in the argument that the trial court committed reversible error by permitting the State to engage Clark in a reenactment of the shooting on cross-examination. It was within the trial court's discretion to control the extent of cross-examination.... The reenactment was relevant to the issues in the case and did not deny him a fair trial or violate his privilege against self-incrimination." (Citations omitted).

■ The reenactment here was simply to demonstrate how the shootings occurred. It was responsive to the defendant's testimony on direct examination and his claim of self-defense. We believe where the entire case turns on the claim of self-defense, the specifics acts of the defendant and the victims during the confrontation and shooting are vitally important to both the State's and the defendant's cases. *State v. Thornton*, 498 N.W.2d 670 (Iowa 1993). Because the reenactment was relevant to the self-defense issue, we find it constituted a proper part of cross-examination.[32]

■ Finally, the defendant argues the manner in which the reenactment was conducted made it misleading and, for that reason, the reenactment should have been excluded under Rule 403 of the West Virginia Rules of Evidence.[33] We disagree. First, the defendant did not make a specific objection as required under Rule 103(a)(1) of the

quential fact more or less probable. "Probative value" refers to the strength and force of that tendency.

**32.** It is true, of course, that the prosecutor may not use "artful cross-examination" to introduce otherwise inadmissible evidence such as hearsay. *United States v. Hall*, 989 F.2d 711, 716 (4th Cir.1993), citing *Goldsmith v. Witkowski*, 981 F.2d 697, 704 (4th Cir.1992), cert. denied, —— U.S. ——, 113 S.Ct. 3020, 125 L.Ed.2d 709 (1993). We find the reenactment primarily involved the actions and conduct of the defendant and, as such, was admissible as an admission of a party-opponent under Rule 801(d)(2) of the West Virginia Rules of Evidence.

**33.** Rule 403 of the Rules of Evidence permits relevant evidence to be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice" or other reasons not necessarily relevant here.

Rules of Evidence. At trial, defense counsel merely stated he objected.[34] He offered no specific grounds and did not mention Rule 403.[35] Second, we do not have an adequate record to review the specific actions of each participant in the reenactment. Where the specific conduct in question is not adequately verbalized for the record by counsel, the rulings of the trial court on relevance-related issues are entitled to substantial deference. Third, the reenactment does not need to conform to the defendant's evidence; it is sufficient if it is based on record evidence regardless of its source.[36] As stated earlier, reenactment evidence is admissible if it affords a reasonable inference on a point in issue. We find no error under this assignment.

34. The trial transcript reveals the following exchange during the prosecution's cross-examination of the defendant:

"MR. SPURLOCK: Let the record show an objection to the procedure.
"THE COURT: The objection is overruled.
"MR. SPURLOCK: Show our exception, please."

This general objection was again repeated during the cross-examination: "MR. SPURLOCK: Let the record show a continuing objection to this line of questioning, Your Honor, and to this procedure." The trial court did not respond to this request. Because a trial court has no obligation to exclude evidence *sua sponte*, a defendant who fails to make a specific and timely objection has waived the right to raise the issue on appeal.

35. We believe the trial court properly could have admitted the reenactment evidence even had there been a timely and specific Rule 403 objection. The reenactment was relevant to the defendant's credibility, especially after just having told the jury how the incident happened. Furthermore, it enabled the jury to see whether it was physically possible for the defendant to have acted as he had testified.

36. The defendant makes a lot of to do about the discrepancies between the reenactment and his oral testimony. The trial court never was told by defendant what those discrepancies were. Here, again, the objection does not conform to our specific objection rule. The record reveals the following exchange:

"MR. SPURLOCK: Objection, Your Honor. This in no way accurately represents what happened.
"THE COURT: He [the defendant] was there and he's testifying to it. He should be able to accurately represent what happened."

Aside from being incomprehensible, the objection failed to point out the area of the reenactment that was considered misleading. It must be remembered that the defendant was being asked to demonstrate what he and the victims were doing at the time of the shootings. The fact that the demonstration reveals inconsistencies with the defendant's oral testimony is not subject to redress under Rule 403. Indeed, Rule 403 does not protect against all evidence that is prejudicial or detrimental to one's case, but only against evidence that is unfairly prejudicial. The evidence clearly bore upon the defendant's credibility. The jury was entitled to decide for itself whether the defendant's claim of self-defense was believable even if the defendant contends the reenactment was not accurate. *State v. Gil*, 543 A.2d 1296 (R.I.1988). To the extent some facts were missing or even misrepresented, the omission was curable on redirect examination.

The defendant now claims on appeal that the prosecution was permitted to have the defendant place the gun against the head of the prosecutor who was portraying the victim, Mr. Eckert. Specifically, the defendant's appellate brief states:

"[The prosecutor] in questioning the defendant required defendant to extend the defendant's arms; place a .38 caliber pistol against ... [the prosecutor's] head; testified himself by saying 'contact wound' when defendant's demonstration did not reflect a contact wound and generally bullied the defendant by the prosecution's own self-created demonstration of the events leading to the homicides[.]"

We would agree with the defendant's assessment if there was not record evidence supporting the prosecution's version. In *Key v. State*, 149 Tex. Crim. 200, 192 S.W.2d 563 (1946), the court held that factors listed by the defendant did not render the demonstration inadmissible. In so holding, the court distinguished an earlier Texas case in which the reenactment was held inadmissible on the ground it was not a transaction testified about *by any witness*, "but merely a spectacular exhibition before the jury." 149 Tex.Crim. at 206, 192 S.W.2d at 566. We do not find the demonstration here to be a "spectacular exhibition" without evidence in the record justifying it. The prosecution witness, Dr. Irvin Sopher, supported the State's version. He stated on direct examination as follows:

"The gentleman was fully clothed. The subsequent examination of Mr. Eckert showed that he died of a single gunshot wound of his head. The examination showed that the weapon, the end of the muzzle of the gun, was at pointblank contact with the center of his forehead. That is it was a contact gunshot wound, what we call a contact gunshot wound."

Based upon the record, we are unable to find an abuse of discretion.

## V.

## INSTRUCTIONAL ERROR

In his last assignment of error, the defendant asserts the trial court, over his objection, improperly gave a jury instruction on malice and intent. The contested instruction reads as follows:

"The Court instructs the jury that malice and intent may be inferred from the defendant's use of a deadly weapon, under circumstances which you believe do not afford the defendant excuse, justification or provocation for his conduct.

"Where it is shown that the defendant used a deadly weapon in the commission of a homicide, then you may find the existence of malice from the use of such weapon and other surrounding circumstances, unless there are explanatory or mitigating circumstances surrounding the case which you believe affords the defendant excuse, justification or provocation for his conduct. You are not obliged to find, however, and you may not find the defendant guilty, unless you are satisfied that the State has established the element of malice beyond a reasonable doubt."

According to the defendant, this instruction suggested to the jury that malice and intent could be inferred by the use of a weapon regardless of whether there are justifications for a defendant's use of a weapon. Furthermore, it is argued that the "qualifiers" given later in the instruction did not erase the earlier inference that malice may be inferred solely from the use of a weapon. We find no merit in the defendant's argument.

We begin this inquiry by noting some of the fundamental principles that govern our review of jury instructions. The court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are re-

viewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not misled by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy.[37] The trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to the circuit court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion. *See State v. Derr*, 192 W.Va. 165, 179, 451 S.E.2d 731, 745 (1994).

The defendant relies on *State v. Jenkins*, 191 W.Va. 87, 443 S.E.2d 244 (1994); *State v. Louk*, 171 W.Va. 639, 301 S.E.2d 596 (1983), *overruled*, *State v. Jenkins, supra*; and *State v. Kirtley*, 162 W.Va. 249, 252 S.E.2d 374 (1978), to support his argument. We believe the defendant misunderstands the principles set forth in those opinions.[38] In *Jenkins*, we found a jury instruction discussing malice was improper for three reasons: (1) the instruction erroneously stated " 'it is not necessary that malice should exist in the heart of the defendant' " in order to convict the defendant of murder, 191 W.Va. at 92, 443 S.E.2d at 249; (2) the instruction indicated that malice may be inferred from the use of a weapon without explaining that this inference is only permissible in the absence of valid justifications; and (3) the instruction shifted the burden of proof from the prosecution to the defendant. None of the defects in the *Jenkins* instruction are apparent in the present case.

The defendant asserts the first line of the instruction in this case "is objectionable because it states that malice may be inferred

---

**37.** The challenged instruction did not undermine the explicit, accurate instructions given with respect to first-degree and second-degree murder. The instruction left no doubt as to the "intent" that was required before the jury could convict on these crimes. It is apparent the circuit court concluded these instructions properly delineated the necessary elements for first- and second-degree murder, and, even if there was a misallo-

cation of the burden of proof as to malice, would therefore not have affected the jury's decision.

**38.** The defendant's reliance on *State v. Louk, supra*, is especially misplaced considering in *State v. Jenkins, supra*, we disapproved of any inconsistent principles concerning inferences that are permissible from a defendant's use of a deadly weapon.

from the use of a deadly weapon." In *Jenkins*, we recognized that prior case law permits the inference of malice from the use of a deadly weapon "so long as the instruction is qualified by language that informs the jury that this may be done if the evidence does not show that the defendant had an excuse, justification, or provocation." *State v. Jenkins*, 191 W.Va. at 94, 443 S.E.2d at 251. The defendant argues the "qualifiers" in the present instruction do not cure the prior defects in the instruction. The present instruction not only clearly indicates the jury may not infer malice from the use of a deadly weapon if there is excuse or justification, it incorporates some of the exact language of Syllabus Points 5 and 6 of *Jenkins*.[39] In fact, the first sentence of the disputed instruction (which the defendant finds the most objectionable) is almost identical to part of Syllabus Point 5.[40] Nothing in this instruction indicates the jury was required to find malice from the use of the weapon nor is there evidence of impermissible burden shifting. The jury was fully informed they must deter-

mine whether there were any valid justifications for the defendant's behavior and they could not find malice unless the prosecution proved malice beyond a reasonable doubt.

The best we can determine from the brief of the defendant is that he wanted the judge to walk through the paradigm of *Jenkins*. The trial court refused for good reason, considering the fact that much of what was said in *Jenkins* is to assist the trial court in understanding our reasoning for reversal as well as our suggestions regarding what should be included in the instruction itself.[41] A judge need not deliver instructions describing all valid legal principles in each and every paragraph of the jury charge, especially when the principle in question describes a permissible but not a mandatory inference. Nor does a judge have to describe every factual scenario that could defeat an inference. Indeed, inferences can be defeated many ways, including the jury's disbelief of a witness. Rather than describing each, the trial judge may and usually should leave the

---

**39.** Syllabus Points 5 and 6 of *State v. Jenkins, supra,* read as follows:

"5.   ' "In a homicide trial, malice and intent may be inferred by the jury from the defendant's use of a deadly weapon, under circumstances which the jury does not believe afforded the defendant excuse, justification or provocation for his conduct. Whether premeditation and deliberation may likewise be inferred, depends upon the circumstances of the case." Point 2, Syllabus, *State v. Bowles*, 117 W.Va. 217[, 185 S.E. 205 (1936) ].' Syllabus, *State v. Johnson*, 142 W.Va. 284, 95 S.E.2d 409 (1956).

"6.   It is erroneous in a first degree murder case to instruct the jury that if the defendant killed the deceased with the use of a deadly weapon, then intent, malice, willfulness, deliberation, and premeditation may be inferred from that fact, where there is evidence that the defendant's actions were based on some legal excuse, justification, or provocation. To the extent that the instruction in *State v. Louk*, 171 W.Va. 639, 643, 301 S.E.2d 596, 600 (1983), is contrary to these principles, it is disapproved."

**40.** The first sentence of the disputed instruction reads as follows: "The Court instructs the jury that malice and intent may be inferred from the defendant's use of a deadly weapon, under circumstances which you believe do not afford the defendant excuse, justification or provocation for his conduct." Compare the above language to Syllabus Point 5, in part, of *Jenkins:* " ' "In a homicide trial, malice and intent may be inferred by the jury from the defendant's use of a deadly weapon, under circumstances which the jury ·

does not believe afforded the defendant excuse, justification or provocation for his conduct." ' " (Citations omitted).

**41.** The taking of verbatim quotes from cases on abstract principles of law is universally condemned. This point was made in *In re Wood's Estate*, 374 Mich. 278, 292, 132 N.W.2d 35, 45 (1965), *overruled on other grounds, Widmayer v. Leonard*, 422 Mich. 280, 373 N.W.2d 538 (1985):

"[W]e caution Bench and Bar ... that the language we use in this appellate opinion may not be adopted uncritically for purposes of jury instruction. What we write is written for minds drilled in the ways of common law, skilled in applying legal abstractions to evidentiary facts, and not for the instructions of jurors. That frequently difficult task of jury instruction rests in the first instance with the trial judge who must translate our legal rulings, cast in the law's shorthand abstractions, into language comprehensible by the jury and directly relevant to the evidentiary facts of the case being tried."

It must be remembered that jurors do not parse "instructions for subtle shades of meaning in the same way that lawyers might." *Boyde v. California*, 494 U.S. 370, 380–81, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316, 329 (1990). Instead, jurors will view the instructions contextually and arrive at a "commonsense understanding of the instructions in the light of all that has taken place at the trial[.]" *Boyde*, 494 U.S. at 381, 110 S.Ct. at 1198, 108 L.Ed.2d at 329.

subject to argument of counsel. In the present case, defense counsel argued this issue effectively to the jury; neither the judge nor the prosecution so much as hinted that any legal obstacle stood in the way. More specific instructions on this subject were unnecessary. Therefore, we find the trial court did not err in delivering this instruction.

## VI.

### CONCLUSION

Our review of the record as a whole and each specific assignment of error fails to reveal any reversible error in either of the defendant's trials. For the foregoing reasons, the judgment of the Circuit Court of Wayne County is affirmed.

Affirmed.

BROTHERTON, J., did not participate.

FOX, J., sitting by temporary assignment.